IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, INC.,
SIERRA CLUB,
WEST VIRGINIA HIGHLANDS
CONSERVANCY, INC. and
VIRGINIA RIVERS COALITION,

                Plaintiffs,

v.                                CIVIL ACTION NO.  3:15-0271

GINA MCCARTHY, Administrator,
United States Environmental Protection Agency and
SHAWN M. GARVIN, Regional Administrator,
United States Environmental Protection Agency,
Region III,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is a Motion by West Virginia Coal Association ("WVCA") to intervene as a defendant in this administrative review action. ECF No. 20. In this case, the Ohio Valley Environmental Coalition ("OVEC") and others (collectively "Plaintiffs") have challenged an action of the United States Environmental Protection Agency ("EPA"). Specifically, Plaintiffs challenge EPA's approval of the West Virginia Department of Environmental Protection's ("WVDEP") decision to not develop Total Maximum Daily Loads ("TMDLs") for certain West Virginia streams previously identified as "biologically impaired" due to "ionic stress." Plaintiffs seek an order that declares EPA's approval in violation of law, and which requires EPA to develop TMDLs for ionic toxicity for the identified streams. WVCA claims that its intervention in this case is warranted as a matter of right under Federal Rule of Civil Procedure 24(a)(2), and alternatively,

permissibly under Rule 24(b). Plaintiffs oppose WVCA's intervention in this case, and EPA takes no position on intervention. For the reasons offered below, the Court **DENIES** WVCA's Motion to Intervene but **GRANTS** WVCA amicus curiae status in this action.

## I.      Background

### A.  Clean Water Act

For the sake of deciding this motion, some background on the Clean Water Act ("CWA") is in order. The CWA is intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a). The CWA prohibits anyone from discharging pollutants from "point sources" into bodies of water unless the discharging entity does so in compliance with a National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311(a); 1342(a); 1362(12), (14). An NPDES permit grants the holder a right to discharge pollutants in amounts below thresholds set in the permit. 33 U.S.C. § 1311(b), 1342(a); 40 C.F.R. § 122.1 *et seq*. The State of West Virginia, through the WVDEP, administers NPDES permits for point sources within its jurisdiction. W. Va. Code § 22-11-4.

The CWA also requires each state to establish water quality standards consistent with the CWA's requirements for bodies of water within the state's boundaries. 33 U.S.C. § 1313(a)(3)(A), (b), (c). These standards include water quality criteria, in narrative form, numeric, or both, which define the amounts of pollutants that may be discharged into specific water bodies. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.10–12. The water quality criteria are set so that specified water bodies may maintain their designated beneficial uses. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 130.2(d), 131.10–12. When existing pollution controls in a water body are not stringent enough to

meet applicable water quality standards, that water body must be classified by the state as "impaired." 33 U.S.C § 1313(d)(1); 40 C.F.R. § 130.7.

In Section 303(d), the CWA requires that states establish a list of impaired water bodies within their boundaries. 33 U.S.C § 1313(d)(1); 40 C.F.R. § 130.7. States must submit this "303(d) list" to EPA every two years for approval, and within 30 days of the submission, EPA must approve, disapprove, or partially disapprove the state's 303(d) list. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). If EPA disapproves a state's 303(d) list, EPA must establish a list of waters that should have been included in the state's list, and it must populate this corrected list within 30 days of the date of disapproval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). In populating its list, EPA must solicit and consider public comment on what waters should have been labeled impaired. 40 C.F.R. § 130.7(d)(2).

For water bodies classified impaired in a state's 303(d) list, the state must establish a total maximum daily load ("TMDL") for any pollutant "preventing or expected to prevent attainment of water quality standards." 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1)(ii). A TMDL sets the maximum amount of a pollutant that may be discharged into an impaired water body from all point sources combined without exceeding water quality standards. *See* 40 C.F.R. § 130.2(i) (stating a TMDL is "[t]he sum of the individual [waste load allocations or "WLAs"] for point sources and [load allocations or "LAs"] for nonpoint sources and natural background"); *see also Ctr. For Biological Diversity v. EPA*, No. 13-1866, 2014 WL 636829, at *2 (W.D. Wash. Feb. 18, 2014) (citing *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1520 (9th Cir. 1995)). TMDLs themselves do not regulate specific sources of pollutants, as in how much of a pollutant an individual may discharge into a water body; but instead, TMDLs are used by states in designing and implementing other pollution control measures, such as water quality management plans and

the entire framework for granting or denying NPDES permits. *See* 33 U.S.C. § 1313(e) (describing continuing planning process in which states must engage); 40 C.F.R. § 130.6 (water quality management plans), 130.7 (explaining process for "incorporating the approved [TMDLs] into the State's water quality management plans and NPDES permits"); *see also Ctr. For Biological Diversity*, 2014 WL 636829, at *2 (citing *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002).

After being calculated, the state's TMDLs must be subject to public review. 40 C.F.R. § 130.7(c)(1)(ii). Following public review, the state must submit its TMDLs to EPA for review, and EPA must either approve or disapprove the submission. 33 U.S.C. § 1313(d)(2). If the state fails to establish a TMDL deemed necessary by EPA, EPA must calculate that TMDL, seek public comment on EPA's proposed TMDL, consider the comments received, and submit EPA's final TMDL to the state for incorporation into the state's water quality management plan. 40 C.F.R. § 130.7(d)(2).

Based on the TMDL for a given water body, the state determines WLAs for that water body, which establishes the maximum amount of a designated pollutant that a specific entity may discharge through a point source into that water body. 40 C.F.R. § 130.2(h) (WLA is "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs constitute a type of water quality-based effluent limitation."). Thus, a WLA is a type of effluent limitation placed on specific discharging entities, and it is imposed by the WVDEP through the NPDES permit. W. Va. Code § 22-11-4(a)(1); W. Va. Code R. § 47-10-3.1, 3.4.

**B.  WVCA's allegations[1]**

WVCA is a trade association that represents coal producers and ancillary businesses. Memo. of Law in Supp. of Mot. to Intervene 2, ECF No. 21 [Hereinafter *WVCA's Memo. in Supp.*]. WVCA represents West Virginia's coal industry, as well as the thousands of individuals who mine and depend on coal in West Virginia, the nation's second largest coal producing state. *Id.* A number of WVCA members conduct mining operations in West Virginia and hold NPDES permits for water discharges from those operations. *Id.* The NPDES permits allow WVCA permit holders to discharge pollutants from point sources into specific West Virginia water bodies. *Id*

In the years 2009, 2012, and 2014, WVDEP submitted for EPA's approval TMDLs set for streams in certain regions of West Virginia. *See Compl.* ¶¶ 2, 64, 65. WVDEP's submissions for those years did not include any TMDL for water bodies that, according to Plaintiffs, are impaired by "ionic stress." *Compl.* ¶ 3. This omission was due to the fact that WVDEP has never before instituted a TMDL for ionic stress, and EPA has never required WVDEP to do so. *Compl.* ¶ 5; *WVCA's Memo. in Supp.* 2. WVDEP has refused to develop TMDLs for ionic stress on the ground that "[t]here is insufficient information available regarding the causative pollutants and their associated impairment thresholds for biological TMDL development for ionic toxicity at this time." *Compl.* ¶ 28.

According to Plaintiffs, ionic stress occurs when certain pollutants are discharged into water bodies. WVDEP determined that "ionic toxicity is a significant stressor," and "a strong presence of sulfates and other dissolved solids exists in those waters where ionic toxicity has been determined to be a significant biological stressor." *Compl.* ¶ 30. Plaintiffs allege that water bodies

---

[1] For the sake of deciding this motion, the Court accepts as true the following facts alleged by WVCA.

in West Virginia's submission to EPA have been identified by WVDEP as biologically impaired due to ionic stress. *Compl.* ¶ 27, 35; *see also* ¶¶ 41, 45, 57. But the information about ionic stress's causative pollutants is limited, and thus, according to WVDEP, appropriate thresholds related to ionic stress are also undefined at this time. *Compl.* ¶ 30. Regardless of this limited information, Plaintiffs assert the CWA requires that WVDEP develop TMDLs even in the face of a "lack of knowledge." *Compl.* ¶ 20, 85, 89, 93, 97, 101, 106.

In bringing this action, Plaintiffs seek an order that (1) declares EPA's approval of WVDEP's decision to not establish ionic stress TMDLs in violation of a nondiscretionary duty that EPA has, specifically a duty to establish TMDLs for ionic stress in light of WVDEP's failure to do so, and (2) requires EPA to develop TMDLs for ionic stress for the identified streams.

WVCA claims the imposition of TMDLs sought in this action will necessarily result in effluent limits being placed on WVCA members NPDES permits, and these effluent limits would necessarily have a significant and pervasive effect on WVCA members' businesses interests. *WVCA's Memo. in Supp.* 1–2. Specifically, WVCA believes TMDLs for ionic stress would necessarily lead to WVDEP's placing effluent limits on WVCA member NPDES permits, and these limits would, in turn, necessarily diminish the value of coal reserves and property held by WVCA members. *Id.* at 2. Additionally, these expected effluent limits would necessarily require WVCA members to design and implement costly and complex water treatment technology in order to comply with their NPDES permits. *Id.* Therefore, WVCA claims that if this Court grants Plaintiffs the relief sought, the Court's order would jeopardize WVCA members' ability to "maintain their businesses." *Id.*

## II.    Legal Standard

"[L]iberal intervention is desirable to dispose of as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (citing *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). Liberality does not, however, entail resolving every possible doubt in favor of intervention, and Federal Rule of Civil Procedure 24 sets standards for intervention that must be observed and applied thoughtfully by courts. 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1904 (3d ed.), Westlaw (database updated April 2015).

Rule 24 provides two avenues for non-parties to timely intervene in an ongoing suit. Fed. R. Civ. P. 24. Under Rule 24(a)(2), a non-party may intervene as a matter of right if it can demonstrate "an interest in the subject matter of the action; [] that the protection of this interest would be impaired because of the action; and [] that the applicant's interest is not adequately represented by existing parties to the litigation." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (quoting *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991)). When intervention of right is not warranted, a court may nevertheless grant permissive intervention under Rule 24(b) if the non-party has a claim or defense that shares a common question of law or fact with the main action. Fed. R. Civ. P. 24(b).

## III.    Discussion

WVCA argues that it fulfills the criteria to intervene under both 24(a)(2) and (b). Plaintiffs oppose intervention on both grounds, and EPA has not indicated whether it opposes or supports WVCA's intervention. After applying 24(a)(2) and (b) below, the Court concludes that WVCA's intervention in this case is not warranted. First, the Court deals with whether WVCA has a right to

intervene under 24(a)(2). Then, the Court turns to whether it may permit WVCA to intervene permissively under 24(b). Lastly, the Court considers granting WVCA amicus status in this action.

   A.  *Intervention of right under 24(a)(2)*

WVCA argues it should be granted intervention under Rule 24(a)(2) because it has satisfied all requirements for intervention of right. Federal Rule of Civil Procedure 24(a)(2) entitles a non-party to intervene as a matter of right if:

> the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a)(2). The Fourth Circuit has held 24(a)(2) requires: (1) a timely motion to intervene; (2) the applicant has an interest in the subject matter of the action; (3) the protection of this interest would be impaired because of the action; and (4) the applicant's interest is not adequately represented by existing parties to the litigation. *Alt v. EPA*, 758 F.3d 588, 591 (4th Cir. 2014) (motion to intervene must be timely in order to be granted); *Stuart*, 706 F.3d at 349; *Teague*, 931 F.2d at 261 (citing *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976)).

Based on the analysis below, this Court concludes that, although WVCA's motion is timely, WVCA members do not have a significantly protectable interest in this litigation; the members' ability to protect their purported interest will not be impaired by disposition of this action; and WVCA has not met its burden to show an existing party—EPA, a government entity—does not represent the interest WVCA claims to have in this litigation. For these reasons, the Court concludes that WVCA does not have a right to intervene under 24(a)(2).

   **1.  Timely Motion to Intervene**

WVCA contends its Motion to Intervene is timely brought. The Court agrees. In determining whether a motion to intervene is timely, district courts have wide discretion and must

consider, at a minimum: (1) how far the suit has progressed prior to the motion; (2) the prejudice which delay might cause other parties; and (3) the reason for any tardiness in moving to intervene. *Alt*, 758 F.3d at 591; *Gould v. Alleco, Inc.,* 883 F.2d 281, 285 (4th Cir. 1989) (citing *NAACP v. New York*, 413 U.S. 345, 365–66 (1973). Ultimately, the purpose of the timeliness requirement is to prevent a tardy non-party from derailing a lawsuit within sight of its terminus. *Scardelletti v. Debarr*, 265 F.3d 195, 202 (4th Cir. 2001), *rev'd on other grounds*, *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

In this case, WVCA's Motion to Intervene is timely brought. First, other than filing the Complaint, Amended Complaint, and Answer, no other action had taken place in this case before WVCA filed its motion to intervene. No other person or entity moved to intervene prior to WVCA's motion. To this date, the Court has yet to issue a scheduling order, and discovery has not commenced; no formal settlement negotiations have taken place; and no motion to dismiss has been decided. Hence, prior to WVCA's Motion to Intervene, the suit had not progressed beyond the pleadings, and it certainly had not reached an "advanced stage," *see Alt*, 758 F.3d at 591. Second, because the proceeding is in its infancy, no existing party has been prejudiced by the time it took for WVCA to file its motion to intervene. WVCA, having brought its motion approximately four months after the Complaint was filed, *see Compl.*, ECF No. 1; Mot. By W. Va. Coal Assoc. to Intervene as Def., ECF No. 20, did not deliberately forebear filing its motion. Because the suit was in its infancy when WVCA filed its motion to intervene, and because the existing parties were not prejudiced in any way by the time it took for WVCA to file its motion to intervene, the Court finds WCA's Motion to Intervene is timely brought under Rule 24.

### 2.  Significantly Protectable Interest in the Subject Matter of this Litigation

WVCA argues its members have significantly protectable interests in the subject matter of this administrative review action. This Court concludes otherwise below. In the following paragraphs, the Court will explain the sort of interest Rule 24(a)(2) contemplates, consider whether WVCA's interest could constitute such an interest, and then decide whether WVCA has a contingent economic interest under the Fourth Circuit's previous decisions.

To have a right to intervene under Rule 24(a)(2), a would-be intervenor must have "an interest relating to the property or transaction which is the subject of the action." Fed. R. Civ. P. 24(a)(2). [2] While the Rule itself does not specify the nature of the "interest" required for intervention of right, the Supreme Court has clarified that 24(a)(2) requires a "significantly protectable interest." *Donaldson v. United States*, 400 U.S. 517, 531 (1971).

The Fourth Circuit has not iterated a single standard for determining whether an interest is significantly protectable, although it has provided guidance. An applicant has a significantly protectable interest in an action if it "stand[s] to gain or lose by the direct legal operation" of a judgment in that action. *Teague*, 931 F.2d at 261. And "an interest [in an action that is] contingent upon the outcome of other pending litigation constitutes a 'significantly protectable interest,'" even though the interest may be destroyed by the result of that other litigation. *See Morgantown Energy Assoc.s v. Pub. Serv. Comm'n of W. Va.*, No. 12- 6327, 2013 WL 140235, at *3 (S.D.W. Va. Jan. 10, 2013) (citing *Teague*, 931 F.2d at 261). Standing to gain or lose by direct operation of a judgment may not be a necessary condition for an interest to be significantly protectable, i.e., there may be interests more remote that are nonetheless protectable under 24(a)(2), but this standard

---

[2] Associations may intervene to assert their members' interest. *See, e.g.*, *Sierra Club v. Hazardous Waste Treatment Council*, 945 F.2d 776 (4th Cir. 1991).

provides guidance for determining whether an applicant has a significantly protectable interest in a given action.

The Advisory Committee Notes elucidate further the Committee's intended meaning of "interest" in Rule 24. The Note states, "an applicant is entitled to intervene in an action when his [or her] position is comparable to that of a person under 19(a)(2)(i)." Fed. R. Civ. P. 24, advisory committee's note to 1966 amendment. Looking to the 1966 version of Rule 19(a)(2)(i), that section provided, "a person . . . shall be joined as a party . . . if . . . he claims an interest relating to the subject of the action and is so situated that disposition of the action in his absence may impair or impede his ability to protect that interest." Fed. R. Civ. P 19(a)(2)(ii) (1966). Thus, the Advisory Committee intended for courts to use criteria for joinder of necessary parties in deciding whether a party has a significantly protectable interest in pending litigation. This suggests that an applicant should be permitted intervention as of right under 24(a)(2) only in those situations when the applicant would be a necessary party under today's Rule 19(a)(1)(B)(i).[3]

WVCA asserts it has a significantly protectable interest in this litigation because TMDLs developed as result of this litigation "would have a significant and pervasive effect on WVCA members' businesses." *Memo. in Supp.* 4. WVCA's rationale begins by noting that Plaintiffs seek a ruling requiring EPA to promulgate TMDLs for "ionic toxicity," which would be imposed on streams in West Virginia identified as "biologically impaired." WVCA speculates that imposition

---

[3] The Fourth Circuit has indicated that Rule 19(a)(1)(B)(i) directs courts to consider the non-joined party's ability to protect its interests if not joined to the litigation in which the non-party asserts an interest. *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 434 (4th Cir. 2014); *see also Ohio Valley Envtl. Coal., Inc. v. Maple Coal Co*., 808 F. Supp. 2d 868, 889 (S.D.W. Va. 2011); *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 915 (S.D.W. Va. 2010). Since that analysis takes place under another prong of 24(a)(2), the Court does not consider under this prong WVCA's ability to protect its members' interests outside of this litigation. *See infra*, Part III.A.3.

of these TMDLs will certainly result in effluent limits for conductivity, and furthermore, these effluent limits will be placed on NPDES permits held by some of WVCA's members. Conductivity effluent limits placed on WVCA member permits will in turn, according to WVCA, necessarily (1) diminish the value of coal reserves and property held by WVCA members, and (2) require members to design and implement costly water treatment technology in order to comply with the effluent limits. Thus, the business interests that WVCA claims to have in this action are interests in the value of property and coal reserves, and an interest in avoiding costly water treatment procedures that might be required by effluent limits. In sum, WVCA asserts that as a result of a ruling favorable to Plaintiffs, its members will certainly be subject to stricter regulations and thereby suffer reduced property values and increased costs of chemical treatment. On this basis, WVCA claims it has a significantly protectable interest in avoiding an order requiring promulgation of TMDLs.

Plaintiffs oppose intervention by WVCA and point out that WVCA's asserted interest is nearly identical to the interests rejected as insufficient by the United States District Court for the Western District of Washington in *Center for Biological Diversity v. EPA*, No. 13-1866, 2014 WL 636829 (W.D. Wash. Feb. 18, 2014). In *Center for Biological Diversity*, the plaintiff brought an action against EPA seeking a declaration that EPA's approvals of Section 303(d) lists submitted by Oregon and Washington were unlawful. For relief, the plaintiff sought an order compelling EPA to identify additional waters to be placed on Washington and Oregon's lists. *Id.* at *2. Two industry groups attempted to intervene, asserting that if the plaintiff were to prevail, some of their members would face stricter or additional regulation and would likely incur significant increased capital and operating costs necessary to comply with these new regulatory requirements. *Id.* at *3.

The Washington district court in *Center for Biological Diversity* decided the industry groups' claimed interest relating to TMDLs was too attenuated to be significantly protectable under Rule 24(a)(2). *Id.* at *4. The court rejected the industry groups' claim that new TMDLs would necessarily result in stricter regulations in their members' permits, observing that:

> [a] TMDL does not, by itself, prohibit any conduct or require any actions. Instead, each TMDL represents a goal that may be implemented by adjusting pollutant discharge requirements in individual NPDES permits or establishing nonpoint source controls. . . Although NPDES permits must, as a whole, contain limitations that are consistent with the wasteload allocations established in TMDLs, the state retains discretion in determining how the pollutant load is allocated among the various sources . . .

*Id.* (internal quotations and citations omitted). Consequently, the court concluded that too many steps—"steps that involve nebulous 'goals' and the discretion of two public agencies"—lie between a possible order requiring additional TMDLs and any potential new restrictions in permits for the would-be intervenors' interests to be direct enough to constitute a significantly protectable interest. *Id.*

The court in *Center for Biological Diversity* went on to rule that the mere possibility that a suit could lead to more stringent regulations imposed on NPDES permits does not constitute an interest sufficient to warrant a right to intervene. *Id.* at 5. At best, a permit holder might have a remote economic interest in the litigation, one shared by every entity that possesses a permit to discharge into water bodies in the subject state. *Id.* The court agreed with other courts that, "an undifferentiated, generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right." *Id.* at 6 (citing *S. California Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002) *modified by,* 307 F.3d 943 (9th Cir. 2002); *ManaSota–88, Inc. v. Tidwell*, 896 F.2d 1318, 1322 (11th Cir. 1990)).

*Center for Biological Diversity* also considered and rejected an argument that reversing EPA's decision would adversely affect permit holders' real property values. *Id.* at 7. The industry groups provided no explanation for their diminished property value theory other than alleging that a ruling reversing EPA's decision would adversely affect their property values. *Id.* The court rejected the industry groups' argument that they had sufficient interests in the litigation stemming from expected diminished property values. *Id* First, the court noted the suit was not one where an adverse ruling would impair or restrict the use of any permit holder's real property, then it found the groups failed to allege how the suit could negatively affect permit holders' property. *Id.*

This Court finds *Center for Biological Diversity* instructive and its reasoning persuasive. Relief for Plaintiffs in this case would not *necessarily* directly or indirectly affect any interest held by WVCA members.[4] If Plaintiffs receive a favorable ruling, whether permit revisions are required at all is a decision that will be made at the discretion of federal and state agencies after several steps of administrative processes subject to public comment or review. For instance, assume Plaintiffs get the relief they seek—an order requiring EPA to develop TMDLs for ionic toxicity for certain West Virginia streams. In that event, the Court's order would only mandate that EPA begin the administrative process of promulgating TMDLs for conductivity.[5] After EPA

---

[4] The Court notes that having an existing NPDES permit at stake in an action can confer a significantly protectable interest in that suit. *See Sierra Club v. EPA*, 995 F.2d 1478, 1486 (9th Cir. 1993), *abrogated on other grounds by, Wilderness Soc.*, 630 F.3d 1173. However, this case does not directly challenge or directly affect any existing permit held by WVCA members, nor would its disposition for or against Plaintiffs necessarily change conditions imposed by WVDEP in existing permits or permit applications.

[5] EPA would promulgate TMDLs by informal rulemaking, *see* 5 U.S.C. § 553(c) (mandating formal rulemaking procedures if statute requires rulemaking after hearing on record); 33 U.S.C. § 1313(d)(2) (not requiring rulemaking or adjudication after hearing on record, *i.e.*, formal rulemaking or adjudication), and WVCA members would be entitled to at least participate in notice and comment procedures required by EPA's regulations, *see* 40 C.F.R. 130.7(d)(2) ("Regional Administrator shall promptly issue a public notice seeking comment on such listing and loadings.").

promulgates TMDLs, WVDEP would then be tasked with deciding whether the TMDLs necessitate effluent limits on affected streams in West Virginia.[6] On one hand, it is possible that TMDLs crafted by EPA will require effluent limits, but at this stage, it is just as possible that TMDLs would not necessitate any effluent limits. If effluent limits *are* required, WVDEP would undergo the administrative process of deciding how to revise existing permits, if that is necessary at all, and how to impose new effluent limits on new permit applications.[7] In deciding how to impose effluent limits for each stream, WVDEP will decide how to spread effluent limits across multiple point sources discharging into the same water body.[8] Thus, at a glance, this Court cannot even begin to speculate on several matters that are pertinent to whether this Court's ruling will have *any effect at all* down the road on WVCA members' permits, much less their property values and treatment obligations.[9] These unanswered questions are wholly outside the scope of this litigation, making WVCA's interests well outside the scope as well. Because WVCA members'

---

[6] *See* 33 U.S.C. § 1313(d)(2) ("If the Administrator disapproves [state submitted TMDLs], [the administrator] shall . . . establish such loads for such waters . . . and upon such . . . establishment the State shall incorporate them into its current plan under subsection (e) of [§ 1313]"); 33 U.S.C. § 1313(e) (plans for navigable waters include effluent limitations); *see also* 40 C.F.R. § 130.5.

[7] *See* W. Va. Code § 22-11-6 ("water quality standards themselves shall not be considered 'effluent standards or limitation' . . . and shall not be independently or directly enforced or implemented except through the development of terms and conditions of a permit issued pursuant to this article").

[8] *See* 33 U.S.C. § 1342(b) (state permit programs must issue permits in compliance with effluent limitations standards set forth at 33 U.S.C. § 1311); 40 C.F.R. § 130.2(h) (providing that WLA, a type of effluent limitation, is the portion of a TMDL allocated to a point source); W. Va. Code § 22-11-11 (stating permits will be issued if applicant seeking permit will not violate any effluent limits); *see generally* 40 C.F.R. § 130.5 (state's continuing planning process requires development of TMDLs, effluent limits, and establishing priorities for NPDES permit issuance).

[9] For instance, if TMDLs must be developed, what will their content be? Will TMDLs crafted as result of this case necessitate any effluent limits for any West Virginia streams at all? If so, what will be the substance of those effluent limits? How will WVDEP decide to impose effluent limits in existing permits or permit applications? And the greatest question is: Will WVDEP's decision to institute effluent limits have any effect at all on WVCA members' property interests or treatment obligations?

predicted permit changes will occur, if at all, not until after multiple interim steps have been taken by federal and state administrative agencies, a judgment for Plaintiffs would not necessarily affect WVCA members' NPDES permits, much less their property values, coal worth, or treatment obligations. Thus, WVCA members will not gain or lose directly by the disposition of this case. *See Teague*, 931 F.2d at 261.

Furthermore, cases denying motions to intervene in circumstances similar to WVCA's are legion; the Court will briefly consider the applicability of four such cases here. First, in *Oregon Environmental Council v. Oregon Department of Environmental Quality*, 775 F.Supp. 353 (D.Or. 1991) the district court concluded that industries holding permits from the Oregon environmental protection agency were not entitled to intervene as a matter of right in a lawsuit against the agency alleging that it had issued the permits in violation of the Clean Air Act. The industries did not have a significantly protectable interest, according to the court, because in suits "brought to require compliance with federal statutes . . . , the governmental bodies charged with compliance can be the only defendants." *Or. Envtl. Council*, 775 F.Supp. at 358 (internal quotations and citations omitted). In this case, EPA is the governmental body charged with complying with the CWA. The subject matter of this action is an agency decision. WVCA does not have an interest in defending an agency decision—EPA's approval of a decision to not effectuate TMDLs—because that decision is an agency matter, and the decision does not pertain specifically to WVCA members' permits. Nor is the substantive content of TMDLS the subject of this lawsuit. WVCA members' business interests in the content of TMDLs therefore do not relate directly to the transactions that are the subject of this action, a federal agency's decision approving the decision of a state agency. *See Our Children's Earth Found. v. EPA*, No. 05-05184, 2006 WL 1305223, at *3 (N.D. Cal. May

11, 2006). Thus applying the reasoning of *Oregon Environmental Council*, WVCA cannot serve as a defendant in an action where EPA is the defendant asserting its compliance with the CWA.

Second, the interest of the general business trade association held insufficient in *United States v. Metropolitan St. Louis Sewer District*, 569 F.3d 829 (8th Cir. 2009) mirrors WVCA's interest in this action. In *Metro. St. Louis Sewer District*, a business trade association was not entitled to intervene as of right in an enforcement action brought under the CWA by the United States and the State of Missouri against an agency managing the City of St. Louis's sewer and waste-water system. The Fifth Circuit ruled the association lacked a significantly protectable interest because, although a ruling in the case could affect the association's members' economic interests, this interest was too tangential to the core issues of the enforcement case to establish the association's right to intervene under Rule 24(a). *Metro. St. Louis Sewer Dist.*, 569 F.3d at 839–40. Here, WVCA asserts that a ruling in Plaintiffs' favor in this administrative review action could have an economic impact on their property, coal reserves, and water treatment obligations. Looking to *Metro St. Louis Sewer District* for guidance, WVCA's remote economic interest in this administrative review case is tangential to the core issue of an enforcement action under the CWA. *Id.*

Third, *Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 224 F.R.D. 694, 700 (N.D. Ga. 2004) rejected as insufficient an interest of taxpayers in a case under the CWA that is very closely related to WVCA members' interests in this action. In *Upper Chattahoochee Riverkeeper Fund,* an association of taxpayers did not have a right to intervene in an action to enforce the City of Atlanta's compliance with the CWA. The taxpayers alleged interests based on the expected financial impact on them resulting from water improvement projects necessitated by the consent decrees between the parties. The court held this interest was not significantly

protectable. Although the members would be economically affected by the consent decrees, the taxpayer's interests, were "only peripherally related to the subject matter of the litigation." *Upper Chattahoochee Riverkeeper Fund*, 224 F.R.D. at 701. In this case, WVCA asserts that TWMDLs could lead to effluent limits that could lead to NPDES permit revisions that could lead to an economic impact on WVCA members' businesses. This sort of interest in avoiding a far-off possible economic impact is, applying the reasoning from *Upper Chattahoochee Riverkeeper Fund*, a peripheral economic interest insufficient to constitute a significantly protectable interest under 24(a)(2). *Id.*

Finally, *Wildearth Guardians v. United States Forest Service*, 573 F.3d 992 (10th Cir. 2009) clarifies what sort of economic interest is significantly protectable in an administrative review action like this one, and WVCA members do not have such an interest in this litigation. In *Wildearth Guardians*, a coal mine owner had an interest sufficient to intervene as of right in an environmentalist organization's action challenging the U.S. Forest Service's (USFS) decision approving the owner's plans for expanding the mine and for venting methane gas from it. The owner had a significantly protectable interest in the litigation challenging USFS's decision regarding his mine because the mine's operations would be impaired, or even halted, if the environmentalists obtained the relief they sought—a declaration that USFS's approval violated federal law and an injunction against expansion and venting. *Wildearth Guardians*, 573 F.3d at 995–96. In this case, Plaintiffs are not challenging EPA's approval of plans submitted by any WVCA member, an EPA decision regarding a WVCA member's permit, or any EPA action that otherwise bears directly or even closely on any WVCA member's mine, property, or treatment procedures. If Plaintiffs were challenging an EPA decision bearing directly on a WVCA member's permit, mine, property, or treatment procedures, most likely the mine owner, and maybe WVCA,

would be entitled to intervene as of right. However, this case is different from *Wildearth Guardians*; here, Plaintiffs challenge an EPA decision that may at some point in the distant future tangentially affect some property, coal mines, or treatment processes of WVCA members. That remote possibility of an interest affected by this Court's decision is too speculative to find WVCA has a significantly protectable interest in this litigation. *See Ctr. for Biological Diversity*, 2014 WL 636829, at *4; *see also Teague*, 931 F.2d at 261.

Next, the Court considers whether WVCA members have the sort of contingent economic interest that the Fourth Circuit has previously held sufficient for intervention of right. WVCA asserts that the Fourth Circuit has expressly recognized the sort of "contingent economic interests" espoused by WVCA as sufficient to warrant intervention of right under 24(a)(2). WVCA supports its proposition by citing *JLS, Inc. v. Public Service Commission of West Virginia*, 321 Fed. Appx. 286, 289-90 (4th Cir. 2009) (unpublished per curiam opinion) and *Feller*, 802 F.2d at 722. Assuming the Fourth Circuit has recognized contingent economic interests as interests within the meaning of 24(a)(2), *see City of New Martinsville v. Pub. Serv. Comm. of W. Va.*, No. 12- 1809, 2012 WL 6694078, at *3 (S.D.W. Va. Dec. 21, 2012) (citing *Teague,* 931 F.2d at 259), WVCA's interests fall outside the scope of any contingent economic interest previously recognized by the Fourth Circuit. Immediately below, the Court explains why it finds that WVCA's interest in this action is distinguishable from the contingent interests found sufficient in *JLS, Feller,* and *Teague*.

The interest the Fourth Circuit found sufficient in *JLS* is different from the interest asserted by WVCA in this case because WVCA's interest, unlike the interest in *JLS*, is contingent upon several steps of multiple agencies' decision making.[10] The Fourth Circuit in *JLS* held that several

---

[10]   As an initial matter, this Court notes that *JLS* has little precedential value, since it is unpublished and therefore is not binding authority to be applied in this case. Nonetheless, the Court will consider the extent to which the interest found sufficient in *JLS* is comparable to any interest

passenger transportation companies, all in competition with the plaintiff passenger carrier company, had an economic interest sufficient for intervention of right in a suit brought against a state public service commission to declare the plaintiff exempt from state regulations of the passenger carrier industry. *JLS*, 321 Fed. Appx. at 290. The Fourth Circuit held the companies had a significantly protectable interest because the suit would determine the level of competition the companies would face, and thereby, the amount of income they could expect to earn. *Id.* The economic injury directly threatened by one possible outcome of the litigation gives rise to a significantly protectable interest. *See id.* (citing *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002)). In the instant case, any potential harm to WVCA members is much more speculative and more remote than the possible harm in *JLS*. Unlike the prospect of harm to WVCA members in this case, the harm threatened to the *JLS* intervenors was certain to follow if the court entered judgment in favor of the plaintiff. The certainty of the economic harm in *JLS* was guaranteed by sound principles of business: an increase in competition results in a decrease in wages for the intervenors. All other things being equal, that is a proven-to-be-true principle of business. There is no such certainty of harm to WVCA members' business interests in this case. A ruling for Plaintiffs in this case would only require EPA to take an action, which one can only speculate as to whether that action will, after a series of decisions by EPA and WVDEP, even have any effect at all on WVCA members. On this basis, the Court finds *JLS* distinguishable from the present action.

For similar reasons, the interest the Fourth Circuit found sufficient in *Feller* is different from the interest asserted by WVCA in this action. In *Feller*, the Fourth Circuit held that three categories of domestic apple pickers had a significantly protectable interest in a suit brought by

---

WVCA members have in this case.

apple growers against the Department of Labor over its decision to deny certifications to the growers. *Feller*, 802 F.2d at 729–30. The domestic pickers in the first group had a sufficient economic interest in the litigation, the Fourth Circuit ruled, because if the action was decided in the plaintiffs' favor, the first group would have its wages directly affected by the court's order. *Id.* The second group had a sufficient economic interest because, as a result of a possible judgment for the plaintiffs, they would lose wages due to increased competition that was certain to follow a ruling in plaintiffs' favor. *Id.* at 730. The third group had a sufficient interest, namely an interest in preventing conflicting orders. *Id.* This case does not involve the sort of contingent economic interest that *Feller* found sufficient for intervention of right. Any potential harm to WVCA members is far more speculative and more remote than the harm threatened to the *Feller* intervenors. Unlike the prospect of harm to WVCA members in this case, the economic harm threatened to the first two groups of intervenors in *Feller* was certain to follow a judgment in the plaintiffs' favor. If the district court in *Feller* entered judgment for plaintiffs, and required DOL to permit the growers to pay pickers at wages not set by DOL, the first group would have had their wages directly affected by that order because their earnings were contingent upon the DOL-set wage. *Id* at 729–30. The second group would have had their wages directly affected by the court's order because their wages were contingent upon foreign workers being either unavailable for work or available only at a higher wage, which the court's ultimate judgment would decide; notably, if the court ruled in favor of the defendants, this necessarily would have resulted in a higher wage for the intervenors. *Id.* Here, a ruling either way carries no certainty of harm or benefit to WVCA members' business interests. Granting Plaintiffs' requested relief would only require EPA to take an action—set TMDLs—which one can only speculate as to whether that action will, after a series

of decisions by EPA and WVDEP, even have any effect at all on WVCA members. For this reason, the Court finds *Feller* distinguishable from this case.

Lastly, the contingent economic interest found sufficient for intervention in *Teague* is distinguishable from the interests asserted by WVCA here. In *Teague*, the Fourth Circuit found the intervenors had a significantly protectable interest in the outcome of a case where a plaintiff-insurance company sought a declaration that it was not liable to the intervenors under an insurance policy for any claims asserted against it in a separate class action brought by the intervenors. *Teague*, 931 F.2d at 261. In short, the Fourth Circuit ruled the plaintiff could not have its cake and eat it too; the plaintiff could not seek a declaration finding it not liable to the intervenors, and then argue the intervenors had an insufficient interest to oppose that declaration. *Id.* The Fourth Circuit supported its holding by noting the intervenors stood to gain or lose directly from the district court's disposition of the coverage question placed before it by the plaintiff. *See id.* ("the Teague Intervenors stand to gain or lose by the direct legal operation of the district court's judgment on ERC's complaint"); *see also id.* ("If [the insurance company] prevails in this declaratory judgment action, the [intervenors] would have to satisfy their judgment from other assets of the insureds and the existence and amount of such assets are questionable.").

Additionally, the Fourth Circuit in *Teague* noted the intervenors' interest was subject to a contingency, but nonetheless found the interest sufficient for intervention as of right. *Id.* Specifically, the intervenor's interest in the court's declaratory judgment was contingent upon the outcome of other pending litigation, namely the separate class action lawsuit brought by the intervenors against the *Teague* plaintiff-insurance company. *Id.* If the intervenors were to lose that other suit, they would have no interest in the declaration sought by the plaintiff in *Teague*. *Id.* Thus, the contingency in *Teague* was that the intervenors had a merely provable, not-already-

-22-

decided claim in another suit. *See id.* The Fourth Circuit decided such a contingency does not prevent proposed intervenors from having a significantly protectable interest in litigation that could extinguish that merely provable claim. *Id.* Notably, the Fourth Circuit was not concerned about the contingent nature of the intervenor's interest, mostly because the intervenors would be affected by a declaration from the court in *Teague* that the plaintiff had no obligation under the policy to the intervenors. *See id.* at 261-62. Thus, based on *Teague*, where a would-be intervenor asserts an interest in a suit, the interest may be significantly protectable even though it is contingent upon the outcome of another pending case.

In this case, the contingency present is entirely different from the contingency in *Teague.* Even if this Court orders EPA to develop TMDLs, there can be no certainty that TMDLs will have any effect on WVCA member's property values, their coal reserve worth, or treatment costs. It will take several steps by administrative agencies—developing TMDLs, promulgating effluent limits, applying those limits to new and existing permits—before the intervenor's business interests could be affected down the causal chain by this Court's order. WVCA stretches the contingency approved in *Teague* beyond its breaking point. *Teague* approved a one-step away contingency—if the intervenors lost their class action lawsuit, they would have had no interest in the *Teague* litigation. Nonetheless, WVCA asks this Court to find one contingency (content of TMDLs that possibly requires effluent limits) based on a second contingency (content of effluent limits that possibly affects permits) based on a third contingency (WVDEP's possible decision to apply effluent limits in a manner that affects WVCA member permits, existing or non-existent) based on a fourth contingency (WVDEP's decision affecting WVCA member permits could possibly adversely affect the members' property values, coal reserve worth, or water treatment

obligations) is a significantly protectable interest. The Court refuses to accept WVCA's invitation to dance the what-if.

Surely, nearly every decision of EPA related to water treatment could have some effect, after several steps down the road, on WVCA members' property values, coal reserve worth, or treatment process obligations. But the Court cannot find a significantly protectable interest based on that theory alone. There must be some limit to the contingencies that courts will accept for purposes of finding an interest significantly protectable under 24(a)(2). Failure to place a limit on the number of acceptable contingencies, accepting all contingencies in favor of intervenors, would be tantamount to this Court's approving intervention on the basis of the "Butterfly Effect." *See Butterly Effect*, WIKIPEDIA, https://en.wikipedia.org/wiki/Butterfly_effect (last visited Nov. 24, 2015) ("In chaos theory, the butterfly effect is sensitive dependence on initial conditions in which a small change in one state of a deterministic nonlinear system can result in large differences in a later state. The name of the effect . . . is derived from the [] example of the details of a hurricane (exact time of formation, exact path taken) being influenced by minor perturbations such as the flapping of the wings of a distant butterfly several weeks earlier."). In ruling on motions for intervention of right, courts could not function properly if they were required to find significantly protectable interests based on multiple layers of contingency. This Court has no crystal ball. And *Teague* neither equips courts with such, nor does it require courts to find interests are significantly protectable when they are dependent upon multiple layers of contingency, such as WVCA members' purported interests in this case.[11]

---

[11] Furthermore, the Court notes that finding WVCA has a significantly protectable interest in this case would open the flood gates for WVCA's intervention in almost any case challenging an EPA decision pertaining to the CWA. If this Court were to find WVCA has a significantly protectable interest in this action simply because the action has a remote possibility of affecting NPDES permits held by WVCA members, the Court would be hard pressed to find any action reviewing

Lastly, WVCA claims, in support of its argument that it has a sufficient interest in this litigation to warrant intervention of right, the Fourth Circuit has "specifically recognized the right of WVCA to intervene in regulatory challenges involving the mining industry," and it cites *Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001) to support this proposition. After reviewing *Bragg*, this Court finds no support for WVCA's claimed blessing from the Fourth Circuit. In *Bragg*, the Fourth Circuit never even considered whether WVCA's intervention was proper or not. Instead, WVCA was already a party to the suit when the suit was appealed to the Fourth Circuit. WVCA's intervention in that case was the product of the district court's unchallenged ruling granting WVCA's motion to intervene. On appeal, the Fourth Circuit was not asked whether the district court properly permitted WVCA to intervene, instead the court of appeals was deciding whether the district court properly granted summary judgment in plaintiffs' favor. To claim that *Bragg* grants WVCA an ongoing right to intervene in regulatory challenges involving the coal mining industry is at best an improper reading of *Bragg*, and at worst, a disingenuous statement of the rule from *Bragg*. Whatever effect WVCA's intervention had in *Bragg*, intervention mattered not to the Fourth Circuit's ruling in that case, and therefore, *Bragg* does not support WVCA's motion to intervene in this case.

For the above reasons, the Court finds that WVCA does not have a significantly protectable interest in this administrative review action sufficient to warrant a right to intervene in it under 24(a)(2). There simply are too many steps—"steps that involve nebulous goals and the discretion of two public agencies"—between a potential judgment in Plaintiffs' favor and any possible

---

an EPA decision related to the CWA where WVCA would not have a significantly protectable interest. In light of such a ruling, WVCA could gain intervention of right in any case where reversing EPA's decision could result in a later decision of EPA or WVDEP that is adverse to WVCA's business interests, no matter how remote the possibility of a later adverse action.

adverse consequence to WVCA members' interests in property, coal reserves, or water treatment costs to find that WVCA has a significantly protectable interest in this litigation. *Ctr. for Biological Diversity*, 2014 WL 636829, at \*4; *see also Teague*, 931 F.2d at 261. Although this finding is dispositive, in the next section the Court assume WVCA has a significantly protectable interest in order to determine whether disposition of this action would impair WVCA's purported interest.

### 3.   Impairment of ability to protect interest

Next, WVCA contends that disposition of this action without it would impair or impede WVCA's ability to protect business interests its members allegedly have in this litigation. The Court disagrees, and concludes below that any interest WVCA members have in avoiding new restrictions imposed on their NPDES permits would not, as a practical matter, be impaired by denying WVCA intervention in this case.

If an interest sufficient to satisfy Rule 24(a)(2) is presented, a court must then ask if the would-be intervenor "is so situated that disposing of the action may as a practical matter impair or impede the [applicant's] ability to protect its interest." Fed. R. Civ. P. 24(a)(2). The question presented by 24(a)(2)'s impairment prong requires a practical analysis, rather than a legal one. Wright & Miller *supra*, at § 1908.2. The impairment prong is satisfied where: (1) disposition of the action would put the movant at a "practical disadvantage" in protecting its interest, or (2) the stare decisis effect of a judgment would legally preclude the would-be intervenor from protecting its interest later. *Francis v. Chamber of Commerce of U. S.*, 481 F.2d 192, 195 n.8 (4th Cir. 1973) (stare decisis is sufficient to satisfy impairment prong); Wright & Miller *supra*, at § 1908.2. The practical disadvantage of filing a separate suit and perhaps duplicating efforts is not sufficient to satisfy the impairment prong. *Francis*, 481 F.2d at 196 (finding impairment prong not met despite would-be intervenor's argument that filing a new action would be difficult to initiate); Wright &

Miller *supra*, at § 1908.2. Additionally, the impairment prong is not met if the would-be intervenor could adequately protect its interests in the action by participating as amicus curiae. *See McHenry v. Comm'r*, 677 F.3d 214, 227 (4th Cir. 2012) (finding impairment prong not met because, in part, would-be intervenor could easily express its views in case through amicus briefs).[12]

WVCA claims that its members' interests in avoiding TMDLs for ionic toxicity will be impaired in three ways if Plaintiffs obtain their requested relief.

First, WVCA contends that an order requiring TMDLS will necessarily result in WVCA members facing reduced property values and being required to invest in expensive treatment technology. *WVCA Memo. in Supp.* 6, ECF. No 24. WVCA points out that Plaintiffs in other suits against WVCA members have sought orders compelling water treatment mechanisms that could cost in excess of $100 million. Thus, according to WVCA, if TMDLs are promulgated, WVCA members will almost certainly be forced to implement costly water treatment endeavors.

WVCA's first argument on the impairment prong fails for at least two reasons. First, an order requiring EPA to develop TMDLs would not necessarily result in reduced property values or expensive treatment requirements for WVCA members because several administrative and judicial steps lay between this Court granting Plaintiffs' requested relief and any possible subsequent revisions to WVCA members' NPDES permits. Consider the following three events necessary to establish effluent limits on streams where WVCA members discharge: (1) after an order granting Plaintiffs relief, EPA would engage in an administrative process to establish the

---

[12] *See also Feller*, 802 F.2d at 730 (finding impairment prong satisfied, in part, because participating by intervenors as amicus curiae would not be sufficient to protect against identified practical impairments); *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 121 (4th Cir. 1981) (practical disadvantage imposed on intervenor by its absence from suit was not significantly relieved by allowing intervenor to participate as amicus curiae).

content of TMDLs, during which WVCA and its members could advocate—by way of submitting comments to EPA—for TMDLs high enough that no property value losses or expensive treatment requirements would be incurred by WVCA members.[13] After EPA promulgates TMDLs, if WVCA disagrees with their content, it could seek judicial review of EPA's decision under the Administrative Procedure Act, 5 U.S.C. § 702. Thus, participating in the administrative process of developing TMDLs' content and seeking judicial review of an EPA decision on their content is the first way that WVCA can pursue its interest in avoiding TMDLs, even if intervention in this case is denied.[14] After TMDLs are promulgated and judicially reviewed, (2) WVCA may adequately protect its members' business interests by participating in WVDEP's process of translating EPA's TMDLs into effluent limits specific to each discharging entity, also known as WLAs imposed on point sources.[15] Lastly, (3) WVCA members may protect their business interests at the permitting stage, both in forming the content of their permit applications and in seeking administrative and judicial review of WVDEP's decisions on their applications.[16] Thus, there are several discretionary administrative and judicial steps between this Court granting

---

[13] *See* 40 C.F.R. § 130.7 ("If the Regional Administrator disapproves such listing and loadings, he shall, not later than 30 days after the date of such disapproval, identify such waters in such State and establish such loads for such waters as determined necessary to implement applicable [Water Quality Standards]. The Regional Administrator shall promptly issue a public notice seeking comment on such listing and loadings. After considering public comment and making any revisions he deems appropriate, the Regional Administrator shall transmit the listing and loads to the State, which shall incorporate them into its current [Water Quality Management] plan.").

[14] *See Ctr. For Biological Diversity*, 2014 WL 636829, at *8 (citing *Our Children's Earth Found.*, 2006 WL 1305223, at *3).

[15] *See* 40 C.F.R. § 130.7(c)(1)(ii) (making TMDLs and individual water quality based effluent limitations subject to public review consistent with the state's continuing planning process); *see also Ctr. for Biological Diversity*, 2014 WL 636829, at *8.

[16] *See* W. Va. Code R. § 47-30-10 ("All draft permits shall be . . . publicly noticed and available for public comment . . ."); W. Va. Code R. § 47-30-3 ("Any denial of the WV/NPDES permit is appealable to the West Virginia Environmental Quality Board in accordance with the procedures and authority of W. Va. Code § 22-11-21"); 5 U.S.C. § 702 (person suffering legal wrong by agency action is entitled to judicial review of the action).

Plaintiffs' relief and any possible effect on WVCA members' business interests. And because those discretionary administrative and judicial steps deal with the actual content of TMDLs and effluent limits on WVCA member permits, WVCA members can better protect their business interests at each of these later steps than they could in this litigation, which does not itself involve the content of TMDLs.

Second, WVCA's argument contains an even deeper flaw, though, because it goes against the very essence of the analysis required under the impairment prong. That prong asks if disposition of the instant action without WVCA would impair or impede WVCA members' ability to protect their interests. According to WVCA, it has an interest in this case because there are other cases where Plaintiffs have sought an order compelling WVCA members to undertake expensive treatment procedures. *WVCA's Memo. in Supp.* 6, ECF No. 21. But in this case, Plaintiffs do not seek any order that would, by its terms or direct effect, require WVCA members to undertake any water treatment endeavors. Nor do Plaintiffs seek an order that would itself restrict or burden WVCA members' properties. Simply put, denying WVCA intervention in this case would not impair WVCA's ability to defend against an order in another case requiring WVCA members to undertake water treatment endeavors. The best and only place to protect an interest in avoiding an order in another case is to participate as a party in that other case, not to intervene in this case. For these two reasons, the Court rejects WVCA's first argument under the impairment prong.

WVCA's second argument under the impairment prong also fails. WVCA asserts that if it is not permitted intervention of right, its interest in avoiding TMDLs will be impaired because in WVCA's absence this Court will not benefit from WVCA's unique understanding of the issues in this case. *Reply* 6, ECF. No 24. To support WVCA's proposition that this unique-understanding argument is pertinent to the impairment prong analysis, WVCA cites *Defenders of Wildlife v.*

*North Carolina Department of Transportation*, 281 F.R.D. 264, 268 (E.D.N.C. 2012). Notably, the district court in *Defenders of Wildlife* cited no authority for the proposition that a non-party's unique understanding might be relevant to an analysis of whether a non-party's ability to protect its interest would be impaired by denying intervention. Nonetheless, in that case, the intervenors claimed their knowledge of facts material to the litigation exceeded that of existing parties. WVCA has made no such allegation here, only that it offers insight from the perspective of the regulated community into the issues this case presents. However, to the extent that the regulated community's insight is pertinent to an administrative review action, one where EPA is tasked with defending its understanding of its duties under the CWA and the Plaintiffs challenge that understanding, any contribution WVCA could make to this Court's understanding of the issues can be gained by adding WVCA as amicus curiae in this case.

WVCA's third impairment prong argument fails too. WVCA contends that if it is denied intervention, its interest in avoiding TMDLs will be impaired because the interests of the existing party-defendant, EPA, are not aligned with WVCA members' interests. As an illustration of the misalignment of these interests, WVCA warns EPA could settle this case in a manner that might harm WVCA members' business interests. *Reply* 6–7, ECF No. 24. The Fourth Circuit has previously rejected the notion that the impairment prong can be satisfied by an existing party's ability to settle a case in a manner that might be adverse to interests of a would-be intervenor. *Westinghouse Elec. Corp.*, 542 F.2d at 217 (ruling impairment prong not met, even though would-be intervenor argued that existing party could settle the case in a manner adverse to interests of applicant). The Fourth Circuit did not find this argument availing in 1976, and neither does this Court almost forty years later.[17]

_____

[17] Moreover, the substance of this argument is more attuned to 24(a)(2)'s adequate representation

For the foregoing reasons, the Court finds that denying WVCA intervention would not, as a practical matter, impair or impede WVCA's ability to protect any interest WVCA or its members arguably have in this litigation. Any interest WVCA members have in avoiding additional restrictions in their NPDES permits would not be impaired by WVCA's absence from this suit because this suit does not involve the content of TMDLs or effluent limits. Future administrative processes and judicial actions that deal with the content of TMDLs and effluent limits are available and serve as better fora for advancing WVCA members' interests in having lenient effluent limitations in their NPDES permits. Furthermore, to the extent that WVCA's absence would impose any conceivable practical disadvantage on WVCA's ability to protect its members' interests, this impairment can be significantly alleviated by granting WVCA amicus curiae status in this case. *See McHenry*, 677 F.3d at 227. Thus, the impairment prong of Rule 24(a)(2) is not met here. Despite, the impairment prong not being met, the Court in the next section will address the final prong for intervention of right.

### 4. Adequacy of representation by existing parties

WVCA asserts that its interest is not adequately represented by existing parties to this litigation, namely EPA. Again, even if WVCA were able to meet the preceding requirements for intervention of right, WVCA has failed to meet its burden under 24(a)(2)'s adequacy prong.

The fourth and final requirement for a right to intervene under 24(a)(2) requires the would-be intervenor to show its interest is not adequately represented by existing parties to the litigation. Fed. R. Civ. P. 24(a)(2); *Stuart*, 706 F.3d at 349 (citing *Teague*, 931 F.2d at 260–61). Where the would-be intervenor shares the same ultimate objective as an existing governmental party, the would-be intervenor must make a "strong showing" of inadequacy. *Stuart*, 706 F.3d at 352.

---

prong, not the impairment prong.

Essentially, in such a case, the would-be intervenor must rebut a "presumption of adequate representation." *Id.* at 353. The presumption of adequate representation is not rebutted by simply showing the would-be intervenor disagrees with the government's "reasonable litigation tactics," or that the would-be intervenor has "stronger" or "more specific" interests than the government. *Id* at 352. Rather, the presumption is rebuttable by showing the would-be intervenor has identifiable adverse interests with the existing government party; the existing parties have engaged in collusion; or the government has committed nonfeasance. *See id.* (discussing district court's analysis); *Westinghouse Elec. Corp.*, 542 F.2d at 216 ("When the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the petitioner must demonstrate adversity of interest, collusion, or nonfeasance.").

In this case, WVCA must make a strong showing that its interests are not adequately represented by EPA. EPA is a government entity. Furthermore, WVCA and EPA share the same ultimate objective because both aim to have this Court affirm EPA's decision to not require or develop TMDLs for ionic toxicity. Therefore, WVCA must rebut the presumption that EPA adequately represents WVCA members' interests. *Stuart*, 706 F.3d at 352.

WVCA has not carried its burden of rebutting the presumption that EPA adequately represents its interests. In its memorandum in support of intervention, WVCA alleges its interest in this case is more specific than EPA's interest. However, the Fourth Circuit has foreclosed this argument by concluding that even where a would-be intervenor's interest is more specific than the government's, this does not rebut the presumption of adequate representation. *Stuart*, 706 F.3d at 352–353. Although WVCA's interest in avoiding NPDES effluent limits is more specific than EPA's interest in having this Court affirm EPA's challenged decision, this allegation does not

rebut the presumption of adequate representation, which may be rebutted by evidence of adverse interests, collusion, or nonfeasance. *Stuart*, 706 F.3d at 352–353. Nor has WVCA rebutted the presumption by alleging it, as a representative of the regulated community, contributes to this Court's understanding of the issues in this action. Even if the Government is incapable of presenting the industry's perspective for this Court's consideration, such a limited view does not constitute adversity of interests, collusion, or nonfeasance. *Id.*

In its reply brief, WVCA again fails to rebut the presumption of adequate representation. WVCA replies that its interests are not "directly aligned" with EPA's, and EPA's interests are not as narrowly defined as WVCA's interests. Neither is sufficient to rebut the presumption because having interests not aligned with or broader than a would-be intervenor's simply does not constitute adversity of interests, collision, or nonfeasance on the part of the governmental party. *Id.* WVCA points out that EPA does not share the same economic stake in this action as WVCA members, and for that reason EPA may not argue as vigorously as WVCA in opposing an order requiring development of TMDLs. The mere allegation that a governmental party could argue less vigorously than members of the regulated industry is at best an argument that the government *could* commit nonfeasance, which is insufficient to rebut the presumption of adequate representation. *See Virginia Uranium, Inc. v. McAuliffe*, No. 15-00031, 2015 WL 6143105, at *3 (W.D. Va. Oct. 19, 2015) (finding nonfeasance absent when government was already diligently and zealously defending the suit). Lastly, WVCA returns to its now-familiar argument that if intervention is denied, EPA could settle this case in a manner that could harm WVCA's interests. However, WVCA does not explain how EPA could settle a case where the only issue in contention is whether or not EPA's decision was unlawful. Moreover, even if EPA were to settle by agreeing to develop TMDLs, developing TMDLs, as explained above, would not itself harm any WVCA

member interests in property, coal, or treatment obligations. Without more, WVCA has not shown how EPA's ability to settle adversely to WVCA's interests raises to the level of adverse interests, collusion, or nonfeasance. That exhausts WVCA's allegations regarding inadequate representation.

For the foregoing reasons, the Court finds WVCA has failed to rebut the presumption that EPA adequately represents WVCA's interests in this case. Said differently, WVCA's interests are adequately represented by EPA, an existing government defendant, which shares the same ultimate objective with WVCA—a decision from this Court affirming EPA's decision to not require or develop TMDLs for ionic toxicity.

To conclude, the Court holds that WVCA does not have a right to intervene in this case under 24(a)(2). Other than the timeliness prong, WVCA fails to satisfy each of 24(a)(2)'s prongs requiring a significantly protectable interest, threatened impairment of that interest if intervention is denied, and inadequate representation by existing parties. For these reasons, the Court **DENIES** WVCA intervention of right under 24(a)(2).

### B. *Permissive intervention under 24(b)*

Next, WVCA asks this Court to grant it permissive intervention in this action under Rule 24(b). As explained below, the Court concludes permissive intervention by WVCA is not proper in this case.

When intervention of right is not warranted under 24(a)(2), a court may nevertheless grant permissive intervention under Rule 24(b) if the non-party files a timely motion for such and has a claim or defense that shares a common question of law or fact with the main action. Fed. R. Civ. P. 24(b). If the would-be intervenor has no claim or defense with a question of law or fact in common with the main action, permissive intervention should be denied. *See Brown v. Eckerd*

*Drugs, Inc.*, 663 F.2d 1268, 1278 (4th Cir. 1981) *vacated on other grounds by*, 457 U.S. 1128 (1982) (citing Wright & Miller *supra*, at §§ 1911, 1916) (finding no abuse of discretion where would-be intervenor's claim presented issues of law and fact in common with those of the class); *see also Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002) *abrogated on other grounds by*, *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). If the Court finds a common question of law or fact, the minimal requirements of Rule 24(b) have been satisfied and it is then within the court's discretion whether to allow intervention. Wright & Miller *supra*, § 1911; *Kootenai Tribe of Idaho*, 313 F.3d at 1111.

In considering permissive intervention, the court must ask 'whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Stuart*, 706 F.3d at 349 (quoting Fed. R. Civ. P. 24(b)(3)). While concerns of judicial economy and need for guidance are not considered under 24(a), these are pertinent to permissive intervention analysis. *In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991). Adding parties to a case almost always results in some delay, and so usually delay alone does not mean that intervention should be denied. Wright & Miller *supra*, § 1913. Instead, Rule 24(b) requires *undue* delay. *Id.* In determining whether extra time would be an undue delay, the court must balance the delay threatened by intervention against the advantages promised by it. *Id.* If there is another adequate remedy available to protect the would-be intervenor's rights, this weighs in favor of denying intervention. *Id.* A court does not err in denying permissive intervention "when undue delay exists without a corresponding benefit to the process, the litigants, or the court, especially where an existing party zealously pursues the same ultimate objectives as a movant." *Lee v. Virginia Bd. of Elections*, No. 15-357, 2015 WL 5178993, at *4 (E.D. Va. Sept. 4, 2015) (citing *Stuart*, 706 F.3d at 355).

In this case, although WVCA's motion to intervene is timely brought, and the Court assumes without deciding that WVCA has a claim or defense that shares a common question of law or fact with this action, permissive intervention is not proper because it would unduly delay resolution of this action and burden judicial resources. "Additional parties can complicate routine scheduling orders, prolong and increase the burdens of discovery and motions practice, thwart settlement, and delay trial." *Stuart*, 706 F.3d at 350. Here, bringing WVCA into the suit by way of permissive intervention would complicate discovery because WVCA would be entitled to discovery from both Plaintiffs and EPA, requiring existing parties to duplicate their discovery efforts. Furthermore, adding WVCA as a party would complicate for the existing parties other aspects of this litigation, including motions practice and any possible settlement negotiations. As for the Court's resources, dealing with an extra party by its very nature requires additional court resources. In fact, if the Court were to grant permissive intervention to WVCA, an association of coal companies with NPDES permits, this would invite WVCA's permit holding members to individually petition for permissive intervention. If such were the case, the Court could not draw a meaningful line that prevents all NPDES permit holders from gaining permissive intervention in this case, since all would have an argument for intervention just as tenable as WVCA's. Just dealing with this flood of foreseeable motions for intervention would cost substantial judicial resources. For these reasons, the Court finds that adding WVCA as a party would result in some amount of delay and cost the court resources.

With regard to an offsetting benefit, the delay and resource consumption that would come with granting permissive intervention are not offset by any corresponding benefit attainable only by intervention rather than amicus participation. The offsetting benefit to existing parties, the court, and this action promised by granting WVCA intervention consists of the Court learning the

arguments of the coal industry in this administrative review action. *See WVCA's Reply in Supp. of Mot. to Intervene* 9, ECF No. 24. Specifically, WVCA seeks intervention in order to argue that EPA has complied with the agency's duties under the CWA. But EPA already zealously advances this argument, and EPA—as an administrative agency possessing expertise in the field of environmental science and being charged with enforcing the CWA—is in the best position to argue its own compliance, *see Ctr. For Biological Diversity*, 2014 WL 636829, at *9. Even assuming arguments contributed by WVCA would be useful in a case where EPA must present its own rationale justifying its decision, *see Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."), the Court finds below that the coal industry's perspective could be gained by granting WVCA amicus status in this case. Thus, although WVCA may offer the unique perspective of the coal industry, granting WVCA intervention as a party instead of granting it amicus status will not benefit resolution of this action, or protect WVCA members' interests.[18] Instead, WVCA's intervention is "likely [only] to result in duplicative briefing adding a layer of unwarranted procedural complexity." *Ctr. for Biological Diversity*, 2014 WL 636829, at *9. As such, adding WVCA as a party would require expending additional court resources without a corresponding benefit attainable only by intervention rather than amicus participation. For these reasons, the Court concludes granting WVCA intervention would unduly

---

[18] Additionally, as discussed above, this administrative review action is not an appropriate forum for WVCA to protect its members' interests in maintaining the existing effluent limits in their NPDES permits. *See In re Endangered Species Act Section 4 Deadline Litig.*, 270 F.R.D. 1, 6-7 (D.D.C. 2010). Should WVCA need to further those interests, it can best do so by participating in the administrative process of setting TMDLs, effluent limits, and permit restrictions, and by filing administrative review actions in response to any agency decisions adverse to its members' interests.

delay adjudication of this action. *Stuart*, 706 F.3d at 355; *Ctr. for Biological Diversity*, 2014 WL 636829, at *9.

To conclude, although WVCA's motion for intervention is timely and the Court assumes WVCA has a claim or defense that has a question of law or fact in common with this action, adding WVCA would unduly delay adjudication of this dispute over EPA's decision. Because granting WVCA intervention would unduly delay and prejudice this litigation, the Court **DENIES** WVCA's request for permissive intervention under 24(b).

*C. Amicus Curiae Status*

Although WVCA is not entitled to intervene under 24(a)(2), and it is improper to grant WVCA intervention under 24(b), it is proper to grant WVCA amicus curiae status in this case.

A non-party denied intervention may nonetheless present its views to the Court if it is granted amicus status. *See Stuart*, 706 F.3d at 355 ("While a would-be intervenor may prefer party status to that of [an amicus curiae], . . . amici often make useful contributions to litigation."). Granting amicus status and deciding to accept amicus briefs is within the discretion of district courts, *see Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970), and "a court does not abuse its discretion in denying permissive intervention when participation . . . as an amicus satisfies the asserted need for intervention," 4 Am. Jur. 2d *Amicus Curiae* § 5 (Westlaw database last updated Nov. 2015) (citing *United States v. State of Mich.*, 940 F.2d 143 (6th Cir. 1991); *Bates v. Jones*, 127 F.3d 870 (9th Cir. 1997)).

In this case, granting WVCA amicus status is proper in light of WVCA's argument for intervention. WVCA seeks intervention in order to offer for the Court's consideration the perspective of the coal industry on the issue of whether EPA's decision is in compliance with the CWA. But WVCA does not need party status to do this. WVCA can adequately offer its

-38-

perspective on any issue presented by this litigation—from the most mundane to the ultimate CWA compliance issue—by appearing and being heard as an amicus curiae. The Court assumes that WVCA's perspective would be useful to the existing parties and this Court, although this is an administrative review action where EPA must defend its decision by offering the actual reasoning behind that decision. For this reason, the Court **GRANTS** WVCA amicus curiae status in this action subject to the conditions explained below.

### IV.    Conclusion

For the previously stated reasons, the Court **DENIES** WVCA's Motion to Intervene. The Court holds that WVCA does not have a right to intervene in this case under 24(a)(2), and permissive intervention under 24(b) is not proper. However, the Court **GRANTS** WVCA amicus curiae status pursuant to the Court's order below.

The Court **ORDERS:**

1.  WVCA may file a memorandum as amicus curiae on any motion in this case.

2.  The deadline for any amicus memorandum is the same as the deadline for the memorandum of the party whose position the amicus memorandum supports. But when the amicus memorandum supports the moving party, the deadline for the amicus memorandum in support is seven days after the filing of the principal motion, with a three-day extension based on electronic service of the motion.

3.  The page limit for an amicus memorandum is the same as the limit for a memorandum of the party whose position the amicus memorandum supports.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:      December 14, 2015

-39-

ROBERT C. CHAMBERS, CHIEF JUDGE