IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, INC.,
SIERRA CLUB,
WEST VIRGINIA HIGHLANDS
CONSERVANCY, INC. and
VIRGINIA RIVERS COALITION,

                          Plaintiffs,

v.                                                CIVIL ACTION NO.   3:15-0271

GINA MCCARTHY, Administrator,
United States Environmental Protection Agency and
SHAWN M. GARVIN, Regional Administrator,
United States Environmental Protection Agency,
Region III,

                          Defendants.

MEMORANDUM OPINION AND ORDER

Pending in this administrative review action are cross-motions for summary judgment

brought by Plaintiffs Ohio Valley Environmental Coalition, Inc. ("OVEC"), Sierra Club, West

Virginia Highlands Conservancy, and Virginia Rivers Coalition (collectively the "Environmental

Groups"), ECF No. 30, and by Defendants Gina McCarthy, Administrator of the U.S.

Environmental Protection Agency, and Shawn Garvin, a regional administrator for the same

agency (collectively "EPA"), ECF No. 38. In this citizen suit pursuant to the Federal Water

Pollution Control Act (Clean Water Act or "CWA"), 33 U.S.C §§ 1251, *et seq*., and under the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.* the Environmental Groups

challenge EPA's failure to disapprove actual or constructive submissions by the West Virginia

Department of Environmental Protection ("WVDEP") that lacked total maximum daily loads

("TMDLs") for certain West Virginia waterbodies previously identified by the agencies as "biologically impaired." The Environmental Groups seek an order declaring EPA's alleged failure in violation of the CWA's process for reviewing state TMDL submissions, 33 U.S.C § 1313, and in violation of the APA's prohibition on agency action that is arbitrary, capricious, abusive of discretion, and otherwise not in accordance with law, 5 U.S.C. § 706(2). 2d Am. Compl. at 35–37, ECF No. 78. The Environmental Groups also request an order requiring EPA to develop TMDLs for all biologically impaired waterbodies. *Id.*

The cross motions for summary judgment require the Court to determine whether EPA complied with the CWA and federal regulations for review of state TMDL submissions. The cross-motions, taken together, raise the following issues: (1) Plaintiffs' organizational standing to bring claims pertaining to certain waterbodies, (2) EPA's liability on Claims 1 and 2, which allege EPA violated a nondiscretionary duty under the CWA to, first, disapprove WVDEP's actual or constructive submissions of no biological impairment TMDLs for biologically impaired waterbodies, some of which are impaired specifically by ionic toxicity, and second, to establish those undeveloped TMDLs, and (3) EPA's liability on Claims 3 through 8, which allege EPA violated the APA by arbitrarily or capriciously approving WVDEP's TMDL Lists for certain waterbodies, which included no ionic toxicity TMDLs despite those waterbodies' state of ionic impairment. Briefing on the cross-motions is adequate for the Court to decide the standing issue, but the Court finds oral argument is necessary to decide the merits of the CWA and APA claims. From the analysis below, the Court **FINDS** the Environmental Groups have standing to bring all claims in the Second Amended Complaint, ECF No. 78. Based on this finding, the Court **PARTIALLY GRANTS** Plaintiff's Motion for Summary Judgment and **PARTIALLY DENIES** EPA's Cross-Motion for Summary Judgment. The issues of CWA and APA liability and proper

relief, remain pending. In a forthcoming Order the Court will schedule oral argument on the remaining issues in the cross-motions for summary judgments.

## I.       Background

### A.   Clean Water Act and Implementing Regulations

The CWA is intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a). To accomplish this purpose, the CWA requires states and the federal government to work together in eliminating water pollution. *See Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) ("The Clean Water Act anticipates a partnership between the States and the Federal Government . . . ."). "The CWA thus divides between the federal government (via the EPA) and the states many of the duties for monitoring and regulating the nation's waters." *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 907–08 (11th Cir. 2007).

In part, the CWA requires each state to establish water quality standards ("WQS") consistent with the CWA's requirements for all waterbodies and waterbody segments within their boundaries. 33 U.S.C. § 1313(a)(3)(A), (b), (c); *see also* 40 C.F.R. §§ 130.2(d), 131.4(a). A WQS identifies (1) the "designated uses" for a particular waterbody (e.g., public water supply, support of aquatic life, and/or recreational uses) and (2) a "water quality criteria" expressed as a level (e.g., a pollutant-specific concentration and/or a narrative condition) that must not be exceeded so that the waterbody can support those uses (e.g., iron concentrations necessary for aquatic life). 33 U.S.C. § 1313(c)(2); 40 C.F.R. § 131.3(i). Several water quality standards may apply to the same waterbody segment. EPA either approves a State's proposed water quality standards or, if it disapproves any of them, promulgates standards for the State. *Id.* § 1313(c)(3). WQS include water

quality criteria, in narrative form, numeric, or both, which define the amounts of pollutants that may be discharged into specific water bodies. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.10–12. The water quality criteria are set so that specified water bodies may maintain their designated beneficial uses, 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 130.2(d), 131.2, 131.10–12. When existing pollution controls in a waterbody are not stringent enough to meet applicable water quality standards, i.e., waterbodies that are not safe enough to support their designated uses, that waterbody must be classified by the state as "impaired." 33 U.S.C § 1313(d)(1); 40 C.F.R. § 130.7.

Next, CWA Section 303(d) requires that states establish a list of impaired waterbodies within their boundaries. 33 U.S.C § 1313(d)(1); 40 C.F.R. § 130.7. Each waterbody on the impaired waters list is known as a "water quality limited segment" ("WQLS"), 40 C.F.R. § 130.2(j), or an impaired waterbody for short. Placing a waterbody on this "303(d) list" is significant because the CWA requires that states target impaired waterbodies on the 303(d) list for pollution control. *Leavitt*, 488 F.3d at 907–08. The CWA also requires states to "establish a priority ranking of impaired waterbodies, taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A); *see also* 40 C.F.R. § 130.7(b)(4). States must submit these 303(d) lists for EPA's review every two years, and within 30 days of the submission, EPA must approve, disapprove, or partially disapprove the state's 303(d) list. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). If EPA disapproves a state's 303(d) list, EPA must establish a list of waterbodies that should have been included in the state's 303(d) list, and it must populate this corrected list within 30 days of the disapproval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). In populating its list, EPA must solicit and consider public comment on what waters should have been labeled impaired. 40 C.F.R. § 130.7(d)(2).

For waterbodies designated impaired in a state's 303(d) list, the state must establish a total maximum daily load ("TMDL") of any pollutant "preventing or expected to prevent attainment of water quality standards." 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1)(ii). A TMDL sets the maximum amount of a pollutant that may be discharged into an impaired waterbody, from all sources combined, without exceeding water quality standards. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.2(e); *see also* 40 C.F.R. § 130.2(i) (stating a TMDL is "[t]he sum of the individual [waste load allocations or "WLAs"] for point sources and [load allocations or "LAs"] for nonpoint sources and natural background"); *Ctr. For Biological Diversity v. EPA*, No. 13-1866, 2014 WL 636829, at *2 (W.D. Wash. Feb. 18, 2014) (citing *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1520 (9th Cir. 1995)). TMDLs must be set "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C); *see also* 40 C.F.R. § 130.7, 130.7(c)(1), 130.2(g)-(i). After the state calculates a TMDL, the TMDL is subject to public review. 40 C.F.R. § 130.7(c)(1)(ii). Following public review, the state must submit its TMDLs to EPA for review, and EPA must either approve or disapprove the submission within thirty days of the submission. 33 U.S.C. § 1313(d)(2). If the state fails to establish a TMDL deemed necessary by EPA, EPA must disapprove the TMDL list within thirty days of the submission. *See* 33 U.S.C. § 1313(d)(2). Within thirty days of the disapproval, EPA must calculate the undeveloped TMDL, *see id.*, seek public comment on EPA's proposed TMDL, consider the comments received, and submit EPA's final TMDL to the state for incorporation into the state's water quality management plan, 40 C.F.R. § 130.7(d)(2); *see also* 33 U.S.C. § 1313(d)(2).

The CWA, by its text, does not require States to submit TMDLs to EPA at any particular interval; instead, it requires States to submit TMDLs to EPA "from time to time." 33 U.S.C § 1313(d)(2). EPA regulations dictate that schedules for submitting TMDLs are determined by the relevant EPA regional administrator and the State. 40 C.F.R. 130.7(d)(1). In 1997 Guidance, EPA recommended that States should plan to establish TMDLs for all impaired waterbodies on their Section 303(d) lists within eight to thirteen years of the initial listing, but recognized that shorter or "slightly longer" times may be needed depending on specific factors and circumstances. A.R. EPA TMDL Guid. Doc. 6 at 3 (JA 977). EPA interprets the CWA to allow states discretion to proceed watershed by watershed or pollutant-by-pollutant, when developing TMDLs. *Id*. at 2 (JA 976). Thus, for example, a state may develop all TMDLs for the various pollutants causing impairment of waterbodies in a single watershed, or they may elect to establish TMDLs for the same pollutant for all waterbodies impaired by that pollutant. West Virginia, for instance, has a five-year schedule for developing TMDLs on a watershed by watershed approach. A.R. W. Va. 303(d) Doc. 20 at 32 (JA 2349); *see also* EPA Memo. Supp. Cross-Mot. Summ. J. 9, ECF No. 73. "WVDEP's TMDL development program has historically attempted to comprehensively address all streams and all impairments in a particular watershed simultaneously." EPA Memo. Supp. Cross-Mot. Summ. J., at 9 (quoting Dunkard Doc. 39 at 77 (JA 821); Upper Ohio Doc. 39 at 72 (JA 1152)).

Once established, TMDLs are used by state and federal agencies to decrease the amount of the pollutant to which that TMDL applies so that the TMDL is not exceeded. *Leavitt*, 488 F.3d at 907–08. For instance, based on the TMDL for a given waterbody, the state determines WLAs for that waterbody, which establish the maximum amount of a designated pollutant that a specific entity may discharge through a point source into that waterbody. 40 C.F.R. § 130.2(h) (WLA is

"[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs constitute a type of water quality-based effluent limitation."). Thus, a WLA is a type of effluent limitation placed on specific discharging entities, and it is imposed by WVDEP through a National Pollution Discharge Elimination System ("NPDES") permit. W. Va. Code § 22-11-4(a)(1); W. Va. Code R. §§ 47-10-3.1, 3.4. TMDLs are used by states in designing and implementing pollution control measures, such as crafting water quality management plans and reviewing permit applications for discharging pollutants per the NPDES. *See* 33 U.S.C. § 1313(e) (describing continuing planning process in which states must engage); 40 C.F.R. § 130.6 (water quality management plans), 130.7 (explaining process for "incorporating the approved [TMDLs] into the State's water quality management plans and NPDES permits"); *see also Ctr. For Biological Diversity*, 2014 WL 636829, at *2 (citing *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002)).

B. West Virginia's Section 303(d) Program

West Virginia's water quality standards include two narrative water quality criteria, which are designed to protect a use of West Virginia's streams related to aquatic life. Those criteria provide:

> 3.2. No sewage, industrial wastes or other wastes present in any of the waters of the state shall cause therein or materially contribute to any of the following conditions thereof:
> . . .
> 3.2.e. Materials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life;
> . . .
> 3.2.i. Any other condition, including radiological exposure, which adversely alters the integrity of the waters of the State including wetlands; no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed.

W. Va. Code R. § 47-2-3.2.e–3.2.i. From 2002 through 2010, West Virginia used the West Virginia Stream Condition Index ("WVSCI") as its methodology for assessing compliance with the narrative criteria that protect aquatic life. *Id.* That methodology "consists of six benthic community metrics combined into a single multimetric index" and results in a "final index score ranging from 0.0 to 100.0." A.R. W. Va. 303(d) Lists Doc. 23 at 2 (JA 2604). A stream does not achieve the narrative criteria for aquatic life uses if its WVSCI is below 68. *Id.* at 5 (JA 2607).

Methodologies like WVSCI detect impairment, but "they do not identify the cause or causes of the impairment." A.R. EPA TMDL Guidance Doc. 12 at ES-1 (Sup JA 4592). Accordingly, in order to identify causes of impairment—a necessary preliminary step for developing a TMDL—EPA has developed a "stressor identification process." *Id.* at ES-2 (Sup JA 4593). In the development of TMDLs, West Virginia routinely performs the stressor identification process. *See, e.g.*, A.R. Dunkard Creek Watershed TMDL Doc. 39 at 12 (JA 756).

West Virginia includes ionic toxicity as a stressor causing biological impairment, and in several waterbodies, the State has found ionic toxicity a significant stressor giving rise to biological impairment. *See, e.g.*, *id.* at 13–15 (JA 757–59). Since 2005, West Virginia has determined that ionic toxicity is the stressor causing biological impairment in at least 179 streams. AR W. Va. 303(d) Lists Doc. 15 at 41, List Page 14, List Page 18, & List Page 25 (JA 1864, 1886, 1890, & 1897) (identifying ionic toxicity as the cause of biological impairment for four streams in the Upper Kanawha Watershed, seven streams in the Coal River Watershed, and six streams in the Gauley River Watershed); AR Upper Ohio South TMDL Doc. 39 at 17 (JA 1097) (identifying ionic toxicity as the cause of biological impairment for nine streams in the Upper Ohio South Watershed); AR Dunkard Creek TMDL Doc. 39 at 15 (JA 759) (identifying ionic toxicity as the

cause of biological impairment for four streams in the Dunkard Creek Watershed); AR Lower Kanawha TMDL Doc. 25 at 22 (JA 559).

In 2012, West Virginia stopped using the WVSCI methodology in generating its 303(d) List because, according to WVDEP, the State Legislature required it when the State Legislature passed Senate Bill 562 ("SB 562"). AR W. Va. 303(d) Lists Doc. 20 at 15 (JA 2332). WVDEP interprets SB 562 as precluding use of WVSCI's methodology for finding biological impairment. *Id.* After West Virginia submitted its 2012 303(d) list to EPA, EPA partially disapproved that list because the State failed to "evaluate all existing and readily available water quality-related data and information, specifically, information related to whether certain waters are achieving West Virginia's narrative water quality criteria as applied to the aquatic life uses." AR W. Va. 303(d) Lists Doc. 23 at 1 (JA 2603). In its letter disapproving the 2012 303(d) List, EPA stated, "Recognizing WVDEP's position that it is unable to carry out the requirement set forth in 40 CFR 130.7(b)(5), EPA has an obligation to take action to ensure that the federal requirement is satisfied." AR W. Va. 303(d) Lists Doc. 21 at 1 (JA 2584). EPA attempted to fulfill its statutory and regulatory obligations by developing a 303(d) List of waters in West Virginia that are not achieving the narrative standards that protect the aquatic life use, i.e., by adding biologically impaired waterbodies to West Virginia's 2012 303(d) List. *Id.*

As for TMDLs, West Virginia has not, to date, developed any TMDLs addressing ionic toxicity in any of the waterbodies included on the State's 303(d) Lists due to biological impairment caused by ionic toxicity. In April 2010, EPA and West Virginia agreed that TMDLs for all ionic toxicity impairments would be developed by the end of 2013. A.R. WVDEP/EPA Meeting Draft Agenda Doc. 14-01 at 2 (JA 3072). In the Fall of 2010, EPA and WVDEP began a project for developing pilot TMDLs for ionic toxicity in four streams in the Upper Kanawha Watershed. A.R.

W. Va. Ionic Stress Background Info. Doc. 136 at 4–5 (Sup JA 5230–31). The project called for completing pilot ionic toxicity TMDLs for those streams by August 2012. *Id.* By February 2012, participants in that project were considering a TMDL endpoint for conductivity of 720 micro Siemens per centimeter (µS/cm) on a 4-day rolling average. A.R. W . Va. Ionic Stress TMDL Dev. Doc. 117-01 at 17 (Sup JA 5224). But on April 6, 2012, WVDEP Secretary Randy Huffman sent a letter to EPA Region III terminating West Virginia's participation in that project, citing passage of SB 562 as the reason for WVDEP's decision. A.R. Doc. 162 (JA 3298–99).

In 2012, WVDEP submitted a draft 303(d) list to EPA that did not set dates for completing ionic toxicity TMDLs for the waterbodies within the six watersheds at issue in this case. Rather, WVDEP cited dates for completing these TMDLs as "TBD - To be determined. TMDLs will be developed as soon as practicable after the effective date of rules enacted pursuant to Senate Bill 562." W. Va. 303(d) List Doc. 20 at pages 4, 8, 9, 10, 11, 44, 50 (JA 2321, 2325–28, 2361, 2367). After reviewing the draft 2012 303(d) list, EPA and the Environmental Groups submitted comments recommending that WVDEP establish dates by which it planned to complete ionic toxicity TMDLs. Supp. A.R.W. Va. 303(d) Lists Doc. 51-01 at 4 (JA 2753) & Doc. 52 at 31 (JA 2785). In response, WVDEP included in its final 303(d) list submitted to EPA in 2014 projected dates for developing ionic toxicity TMDLs, which range from 2020 to 2025, depending upon the watershed. Supp. A.R.W. Va. 303(d) Lists Doc. 53 at 15, 16, 39, 40, 41, 43, 49-54 (JA 2805–06, 2829-31, 2833, 2839–44).

## II.     Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the

evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof of an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III.    Discussion

In their Motion for Summary Judgment, the Environmental Groups contend they have standing to bring all claims in the Second Amended Complaint. EPA's Cross Motion for Summary Judgment contends the Environmental Groups lack constitutional standing to pursue certain claims. As explained below, EPA's arguments are without merit.

The Supreme Court has interpreted the U.S. Constitution's Article III case or controversy requirement as demanding, at an irreducible minimum, that plaintiffs establish their standing to bring each claim by showing they suffered a concrete and particularized injury in fact which is actual or imminent, fairly traceable to the defendant's challenged conduct, and likely to be redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). Organizations may have constitutional standing premised entirely on injuries suffered by their members, provided that other elements of

associational standing are met. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

In this case, Environmental Group members submitted declarations indicating their use and enjoyment of forty-one waterbodies located throughout West Virginia has been diminished due to biological impairment in those waterbodies. That biological impairment has persisted, in part, due to EPA's actions or inactions on West Virginia's TMDL List submissions, which have lacked TMDLs for biologically impaired waterbodies since 2012. The declarations indicate these injuries would be redressed if EPA were ordered to develop TMDLs for biologically impaired waterbodies.

EPA argues the Environmental Groups lack standing in two respects, both related to injury-in-fact. Finding causation and redressability established, and the requirements for associational standing satisfied, *see Retail Indus. Leaders Ass' v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007), the Court considers in turn each of EPA's arguments pertaining to injury-in-fact.

First, concerning the APA Claims, EPA points out Plaintiffs have provided declarations showing their members have suffered injury-in-fact related to waterbodies in only five of six watersheds at issue in these claims.[1] EPA Cross-Mot. Summ. J., at 17–18, ECF No. 73. None of the declarations initially submitted with the Environmental Groups' Motion for Summary Judgment indicated any member suffered an injury related to any waterbody in the Monongahela Watershed at issue in Claim Seven. In response to EPA's Cross-Motion for Summary Judgment,

---

[1] EPA does not contest Plaintiffs' organizational standing to bring claims pertaining to those five waterbodies for which Plaintiffs have submitted declarations.

the Environmental Groups explain the omitted declaration was inadvertent, and that at least one member has suffered an injury related to at least one waterbody in the Monongahela Watershed. ECF No. 71, at 1–2. EPA's Reply does not address this explanation. *See* ECF No. 74. The summary judgment record has been supplemented with a declaration by David Saville, one member of the Environmental Groups who has asserted injury for environmental harm to waterbodies in the Monongahela River. ECF No. 52. Accordingly, EPA's first standing concern has been addressed.

Second, related to the CWA claims, EPA and amicus WVCA contend the Environmental Groups have standing to seek TMDLs only for waterbodies used and enjoyed by the Environmental Groups' members. EPA Cross-Mot. Summ. J., at 17–18, ECF No. 73. EPA contends the members have not established an injury for waterbodies they do not use, therefore the Environmental Groups cannot seek TMDLs for waterbodies in West Virginia that their members do not use. The Environmental groups contend that when an organization's members use a large number of waters throughout a state, the members have a personal stake in water quality throughout the state sufficient to bring an action seeking TMDL development for all waters in the state, even though such members do not use every waterbody where a TMDL is sought. The Environmental Groups support their position with out-of-circuit decisions in TMDL litigation, which are reviewed and discussed below. Based on the following analysis, EPA's argument is unpersuasive. The Environmental Groups have shown their injury and personal stake in this controversy establishes their standing to bring claims seeking TMDLs for all biologically impaired waterbodies in West Virginia, even those not addressed in members' declarations.

To demonstrate an injury in fact for purposes of Article III standing, a plaintiff must show a personal stake in the claim. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972). Having a personal stake means the plaintiff personally suffered some actual or threatened injury as a result

of the putatively illegal conduct of the defendant. *Lujan*, 504 U.S. at 560 n.1. In the environmental context, injury is established where plaintiffs show they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity or inactivity. *Laidlaw*, 528 U.S. at 183 (standing inquiry focuses on injury to plaintiff, not environment). Using an area roughly in the vicinity of the affected area will not suffice, *see Lujan*, 504 U.S. at 565–566, because their use of the affected area proves they are "among the injured." *See Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972) ("[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself [or herself] among the injured."); *see also Lujan*, 504 U.S. at 565–66 (interpreting *Sierra Club*, 405 U.S. at 735). The Supreme Court has rejected an ecosystem nexus theory, which would find a plaintiff who uses some part of a damaged ecosystem has sufficient injury to bring suit for damage to a part of the ecosystem not used by the plaintiff. *See Lujan*, 504 U.S. at 565–66. Where a plaintiff's use of an ecosystem is "not perceptibly affected by the unlawful action in question" standing does not lie. *Id.* at 566. Importantly, however, "the Supreme Court has [n]ever required an environmental plaintiff to show it has traversed each bit of land that will be affected by a challenged agency action." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013).

The U.S. Court of Appeals for the Ninth Circuit has already considered standing in TMDL litigation and rejected the same argument asserted by EPA in this case, i.e., the Environmental Groups' members only have standing to bring a TMDL claim related to the waterbodies they use. *See Alaska Center for Environment v. Browner*, 20 F.3d 981 (9th Cir. 1994). In *Alaska Center*, environmental organizations brought a CWA citizen suit to compel EPA to establish TMDLs for all impaired waterbodies in Alaska. *Id.* at 982. Plaintiffs, four environmental organizations and

their members, showed they had used certain Alaskan waters and were adversely affected by EPA's failure to establish TMDLs required by the CWA. *Id.* at 985. Prior to the case, Alaska had never submitted any TMDLs to EPA, and EPA had not established any TMDLs for Alaskan waters. *Id.* at 983. The relief sought involved a single EPA office and performance of a single duty—to establish TMDLS—mandated by statute. *Id.* at 986. On appeal to the Ninth Circuit, EPA argued the plaintiffs lacked standing. EPA maintained injury was established with respect to only those streams the plaintiffs used, and that the plaintiffs failed to prove injury related to the other 3,000,000 million waterbodies in Alaska. *Id.* at 985. Under EPA's theory, the sort of injury necessary in a case for compelling TMDL development across an entire state would require that plaintiffs show diminished use in every waterbody that would be affected by the state-wide TMDL program. *Id.*

The Ninth Circuit disagreed with requiring the heavy burden for injury that EPA advanced. *Id.* EPA's theory of requisite injury, according to the Ninth Circuit, would unduly interfere with the CWA's statutory scheme imposed by Congress. *Id.* at 986. More precisely, the CWA requires that TMDLS be developed in a prioritized order determined by the State or EPA. *Id.* at 985, 986. Permitting individual plaintiffs to impose their own prioritization by limiting the scope of requested TMDL development to specific waterbodies of paramount concern to them, e.g., limiting TMDL development to waterbodies they used, would disrupt the CWA mandated prioritized order. *Id.* at 985. For these reasons, the Ninth Circuit found the environmental organizations and their members established injury by showing they were adversely affected by inadequate water quality in a representative number of waters throughout Alaska, i.e., in waters throughout the entire area

for which they sought relief. The Ninth Circuit also found that the plaintiffs' injury resulted from EPA's failure to comply with its CWA obligation to establish TMDLs for Alaska. *Id.*[2]

EPA attempts, but fails, to distinguish *Alaska Center* from the instant case. The plaintiffs in *Alaska Center* established injury related to some but not all waterbodies in a state, and EPA argues the plaintiffs had standing, if at all, because they sought an order requiring establishment of *all* TMDLs across the entire state. In the instant case, Environmental Groups seek an order requiring TMDL development for all biologically impaired waterbodies in West Virginia, which EPA characterizes as a specific set of waterbodies. Based on this perceived distinction in the cases, EPA argues: *Alaska Center* is inapplicable here; and to show injury in fact, the Environmental Groups must demonstrate their members used each biologically impaired waterbody in West Virginia where they seek TMDLs; but in this task, the Environmental Groups failed, having submitted declarations showing members used only some but not all of the waterbodies for which they seek TMDLs. Thus, EPA contends, the Environmental Groups lack the injury in fact necessary to seek TMDLs for all biologically impaired waterbodies.

---

[2] A federal district court in Minnesota has also rejected EPA's theory of requisite injury for seeking state-wide TMDL development. *See Sierra Club, North Star Chapter v. Browner*, 843 F. Supp. 1304, 1306 (D. Minn. 1993). In *Sierra Club, North Star Chapter*, environmental organizations brought a CWA citizen suit to compel EPA to establish TMDLs for all water quality limited segments in Minnesota. *Id.* at 1306. To prove their standing, seven members of the environmental organizations submitted declarations that they regularly used waters throughout Minnesota for recreation, but their enjoyment was limited by pollution which should have been regulated under the CWA. *Id.* at 1309. EPA challenged the environmental organizations' standing. *Id.* Although not disputing injuries for waters in the seven declarations, EPA argued the environmental organizations had not established injuries for waters not identified in the declarations. *Id.* In response, the environmental organizations pointed out that the 303(d) process is statewide and should not be limited to waters identified and used by plaintiffs' members, and if plaintiffs could sue to enforce EPA's duties to develop TMDLs only for identified waters, Section 303(d) could never be enforced. *Id.* The district court disagreed with EPA. *Id.* at 1310. The members established injury in fact, according to the district court, by showing they were Minnesota residents who swore to using a large number of waters throughout Minnesota, which gave them a personal stake in the quality of waters throughout the State. *Id.*

-16-

For purposes of assessing injury in fact, however, *Alaska Center* and this case are indistinguishable. The injuries in both cases are identical in all material respects: the organizational plaintiffs' members used some but not all waterbodies where the CWA allegedly required TMDLs. And the relief requested is the same: TMDL development where the CWA requires TMDL development. The distinction EPA finds between the two cases is immaterial. Although the set of TMDLs sought in *Alaska Center* is more extensive than the set sought in this case—i.e., there may be some waterbodies in West Virginia that (1) require a TMDL for a reason other than biological impairment and (2) lack a TMDL—that distinction is immaterial for purposes of assessing injury. The plaintiffs in *Alaska Center* had an injury conferring standing necessary to seek TMDL development for every waterbody in the state, despite the plaintiffs' members having used only some of Alaska's waterbodies; the same is true in this case. Moreover, the Environmental Groups seek a comprehensive set of TMDLs required by the CWA due to the biological impairment of the waterbodies at issue.

In this case, and many cases where plaintiffs bring constructive submission claims, a state has submitted some but not all TMDLs, which in turn means the plaintiffs can seek development of only some but not all TMDLs. In such cases, plaintiffs seek development of TMDLs that should have been developed, but were not. Here, the Environmental Groups are seeking to compel development of TMDLs that should have been developed but were not. Moreover, the Environmental Groups' demonstrated their standing to bring this suit by use of a representative set of waterbodies affected by the alleged impairment due to the lack of TMDLs. Indeed, the plaintiffs in *Alaska Center* used only some of the waterbodies for which they sought TMDL development but demonstrated an injury that conferred standing to seek the missing TMDLs in Alaska. The difference between seeking TMDLs for all waterbodies in a state where no TMDLs have been

established, and seeking TMDLs only for certain waters where no TMDLs have been issued is meaningless in assessing injury. As in *Alaska Center* the Environmental Groups here have established an injury in fact by demonstrating use of a representative set of biologically impaired waterbodies that lack TMDLs, which therefore confers standing on the Environmental Groups to seek TMDLs for all biologically impaired waterbodies lacking a TMDL. *Alaska Center* and this case are the same for purposes of constitutional standing analysis.

In addition, by arguing the Environmental Groups must show injury in each waterbody where they seek TMDL development, EPA and WVCA misunderstand the injury analysis generally required in TMDL litigation. In TMDL litigation like this, plaintiffs allege they have environmental, aesthetic or recreational interests in certain waters that have been harmed by failure to establish TMDLs for some or all waters in a state. The putative harm is inflicted by absent TMDLs, without which pollution damages waters, which thereby injures the plaintiff. It makes little sense to ask if TMDL plaintiffs have suffered harm in each waterbody where TMDLs are sought, when the harm they suffered results from a state-wide TMDL setting process. This sort of blended injury and causation analysis assures Article III's injury and causation requirements are met, while also not setting the standing hurdle unnecessarily high. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (en banc) ("If the plaintiff can show that his [or her] claim to relief is free from excessive abstraction, undue attenuation, and unbridled speculation, the Constitution places no further barriers between the plaintiff and an adjudication of his rights.").

Adopting EPA's theory of injury—that members must have used every impaired waterbody in a state to be injured by lack of TMDLs for all impaired waterbodies—would both deviate from Supreme Court precedent on environmental injury and elevate the injury hurdle

unnecessarily high. Requiring the Environmental Group members to have used all waterbodies at issue in order to claim harm by failure to adopt TMDLs statewide would be similar to requiring the plaintiffs in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, to have either observed or to expect with certainty to observe each distinct animal species whose existence was threatened by the challenged government activity. The Supreme Court did not require such a showing in *Lujan*, *see generally Lujan*, 504 U.S. 555, and it would twist *Lujan*'s analysis of injury, to insist that members seeking statewide TMDL development use every waterbody where TMDLs are sought.

Case law from the Tenth Circuit Court of Appeals similarly supports finding standing. In *Southern Utah Wilderness Alliance v. Palma*, the Tenth Circuit reversed a decision by the district court that found no standing where plaintiffs did not identify specific visits to each of thirty-nine oil and gas leases at issue in the case. 707 F.3d at 1152–53. The Tenth Circuit determined that "[t]he district court misapplied the law when it rejected [the plaintiffs'] standing on the basis that the affidavits failed to show its members have visited each of the leases at issue." *Id.* at 1155. The plaintiffs did not need to visit each of the thirty-nine leases to generate standing. *Id.* Rather, the plaintiffs' claims that they traveled extensively throughout the area in which the leases were located were sufficient to create standing to challenge all thirty-nine leases. *Id.* at 1156.

The Environmental Groups' members likewise use some, but not all, impaired waterbodies throughout the state. In light of the Ninth and Tenth Circuit case law, the Environmental Groups thus have made a sufficient showing that they have standing to compel EPA to develop TMDLs for biologically impaired waterbodies statewide.

EPA also insists that *Alaska Center's* standing theory conflicts with "prevailing precedent finding standing inadequate for broad claims seeking programmatic relief." EPA Reply Supp. Cross-Mot. Summ. J. 2, ECF No. 74. To support its argument, EPA cites *Lujan v. Defenders of*

*Wildlife*, 504 U.S. at 568, and *Sierra Club v. Peterson*, 228 F.3d 559, 556–57 (5th Cir. 2000) as examples. Having reviewed each case, it is clear that they do not support EPA's contention. First, the section of *Lujan v. Defenders of Wildlife* cited by EPA, 504 U.S. at 568 (Part III.B), garnered only a plurality of the Court, not a majority, and in that section the plurality discussed the redressability element of Article III standing, not the injury in fact element. The only part of that section remotely supporting EPA's statement is where the plurality claimed that suits challenging agency programs are "rarely, if ever appropriate for federal-court adjudication," if the agency has violated no law. *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 759–60 (1984)).

The plurality's statement is quite different from EPA's theory that standing is always lacking for claims seeking programmatic relief. Moreover, the plurality's statement does not apply to this case. On the contrary, in this case the Environmental Groups do not challenge EPA's 303(d) program for reviewing lists of impaired waters and TMDLs. Instead, they allege EPA, in carrying out its 303(d) program, has violated the CWA. Second, the portion of *Sierra Club v. Peterson* cited by EPA discusses the final agency action requirement, not Article III standing. Accordingly, neither case cited by EPA demonstrates a prevailing precedent "finding standing inadequate for broad claims seeking programmatic relief."

In sum, the area affected by EPA's challenged conduct constitutes biologically impaired waterbodies throughout West Virginia. The Environmental Groups seek an order requiring EPA to develop TMDLs for all biologically impaired waterbodies throughout West Virginia. The Environmental Groups have demonstrated that failure to establish these TMDLs for West Virginia's biologically impaired waterbodies has injured their members' environmental and aesthetic interests in waterbodies used by the members throughout the state.

The Environmental Group members use forty-one biologically impaired waterbodies situated across West Virginia. These forty-one waterbodies are located in the Upper Ohio River South, Dunkard Creek, Lower Kanawha River, Elk River, Monongahela River and the West Fork River Watersheds. These six watersheds are located throughout the State of West Virginia. The impaired waterbodies used by these members constitute some but not all of the waterbodies allegedly requiring TMDLs. But the members have used impaired waterbodies across West Virginia, including waterbodies within each of the watersheds at issue. Hence, the Environmental Groups demonstrate a state-wide injury caused by lack of TMDLs due to EPA's and WVDEP's failure to, either rightly or wrongly, establish them for biologically impaired waters.

The relief sought involves a single EPA office and performance of a single statutorily-mandated duty—establish TMDLS. Although some TMDLs have been developed in West Virginia prior to 2012, no TMDLs have been developed for biologically impaired waterbodies since 2012. By showing their members' use and enjoyment of waterbodies across West Virginia has been diminished by inadequate water quality, which has persisted, in part, due to a lack of TMDLs, the Environmental Groups have demonstrated that failure to establish TMDLs has injured them, and this injury was caused by EPA's alleged failure to establish TMDLs. *See Am. Littoral Soc. v. EPA*, 199 F. Supp. 2d 217, 232 (D.N.J. 2002) (holding plaintiffs established injury in fact element of standing because they submitted numerous affidavits attesting to their use of section 303(d) waters and that they were injured by EPA's conduct). Therefore, the members have demonstrated an injury giving them a personal stake in their CWA claim that TMDLs should have been developed for all impaired waterbodies in West Virginia, not just those impaired waterbodies used by the members. By showing the absence of TMDLs for biologically impaired waters has

harmed them, the Environmental Groups have established standing to seek an order requiring TMDL development for all biologically impaired streams state-wide.

To conclude, the Environmental Groups have submitted declarations showing their members have a personal stake in compelling the development of TMDLs for biologically impaired waterbodies across West Virginia, showing the members suffered the sort of injury in fact necessary under Article III to seek TMDL development for all biologically impaired waterbodies in West Virginia. Having decided above that all other aspects of standing are met, the Environmental Groups have established their organizational standing to bring all claims in the Second Amended Complaint.[3]

## IV.    Conclusion

From the analysis above, the Court **FINDS** the Environmental Groups have standing to bring all of their claims in the Second Amended Complaint. Based on this finding, the Court **PARTIALLY GRANTS** Plaintiff's Motion for Summary Judgment and **PARTIALLY DENIES** EPA's Cross-Motion for Summary Judgment. The issues of CWA and APA liability and proper relief, remain pending. In a forthcoming Order the Court will schedule oral argument on the issues remaining in the cross-motions for summary judgments.

The Court **DIRECTS** the Clerk to send a copy of this Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        September 9, 2016

ROBERT C. CHAMBERS, CHIEF JUDGE

---

[3] This analysis of EPA's second standing argument also refutes EPA's argument pertaining to Claims 3 to 8 that Plaintiffs lack standing to seek an order requiring TMDL development for waterbodies in watersheds outside of the six watersheds at issue.