**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, INC.,
SIERRA CLUB,
WEST VIRGINIA HIGHLANDS
CONSERVANCY, INC. and
VIRGINIA RIVERS COALITION,

                Plaintiffs,

v.                                 CIVIL ACTION NO.  3:15-0271

SCOTT PRUITT, Administrator,
United States Environmental Protection Agency and
CECIL RODRIGUES, Acting Regional Administrator,
United States Environmental Protection Agency,
Region III,[1]

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Motions for Stay Pending Appeal. ECF No. 91.

In a Memorandum Opinion and Order dated February 14, 2017, the Court granted in part and

denied in part Plaintiffs' motion for summary judgment and ordered Defendants (collectively

"EPA") to comply with the Clean Water Act ("CWA") by approving or disapproving the West

Virginia Department of Environmental Protection's ("WVDEP") "constructive submission of no

TMDLs for all biologically impaired bodies of water for which no TMDL has been developed to

address that impairment within thirty days." ECF No. 87. EPA has not demonstrated extraordinary

---

[1] Scott Pruitt replaced Gina McCarthy as EPA Administrator and Cecil Rodrigues is now Acting Regional Administrator of EPA's Region III in place of Shawn M. Garvin. The Clerk is directed to change the case style to reflect these personnel changes at the EPA.

circumstances required to win a stay. Accordingly, and as set forth in more detail in the remainder of this Memorandum Opinion, EPA's Motion is **DENIED**.

## I.     Background

Plaintiffs brought suit against EPA claiming that it had neglected its duty pursuant to the CWA to address WVDEP's refusal to produce Total Maximum Daily Load ("TMDL") limits for streams designated biologically impaired. As more fully set out in the Court's February 14 Memorandum Opinion and Order, the CWA requires states to develop a TMDL for each body of water deemed by the state to be impaired. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1). The state must then submit those TMDLs to EPA for approval within thirty days. *Id.* If EPA disapproves a TMDL, EPA must then produce that TMDL within thirty days of disapproval. § 1313(d)(2). Where a "state's actions clearly and unambiguously express a decision to submit no TMDL for a *particular* impaired waterbody," *Hayes v. Whitman*, 264 F.3d 1017, 1024 (10th Cir. 2001), known as a "constructive submission," EPA must approve or disapprove of the absence within thirty days of the state's failure. § 1313(d)(2). Were it to disapprove the missing TMDL, meaning EPA believed a TMDL to be necessary, EPA is obliged to produce the TMDL within thirty days. *Id.* If it approves the constructive submission, EPA need not take any further action.

In 2012 the West Virginia Legislature passed legislation to require WVDEP to develop a new methodology to determine which bodies of water are considered biologically impaired pursuant to the state's narrative water quality standards. Letter from Randy C. Huffman, Cabinet Sec'y, WVDEP, to Jon M. Capacasa, Dir., Water Prot. Div., EPA Region III (Apr. 6, 2012), J.A. 3298 [hereinafter Huffman Letter]. Until 2010 West Virginia used the West Virginia Stream Condition Index ("WVSCI") to determine whether a body of water was in compliance with the state's narrative water quality standards. EPA Enclosure 1 Review of W. Va.'s 2012 Section

303(d), J.A. 2597. Where a body of water does not meet the narrative water quality standards, as measured by a failing WVSCI score of 68 or lower, that body of water is considered biologically impaired. *Id.* WVDEP interpreted the 2012 legislation, known as SB 562, to prohibit WVDEP from developing TMDLs to address streams that were deemed to be biologically impaired as indicated by a failing WVSCI score until it could develop a new methodology. Huffman Letter, J.A. 3298. Plaintiffs brought suit against EPA, arguing that WVDEP's refusal to develop TMDLs for biological impairment until it developed a new testing methodology was a constructive submission which triggered EPA's duty to approve or disapprove of the submission of no TMDLs for biologically impaired bodies of water. Second Am. Compl. ECF No. 78. The Court agreed and granted summary judgment in favor of Plaintiffs. Memorandum Opinion and Order, ECF No. 87. The Court ordered EPA to "approve or disapprove WVDEP's constructive submission of no TMDLs for all biologically impaired bodies of water for which no TMDL has been developed to address that impairment within thirty days." *Id.*

The Court then granted EPA's unopposed motion to extend the deadline to comply with the Court's Order by an additional thirty days so that EPA could determine if it would appeal the decision and seek a stay. Order, ECF No. 89. EPA now requests a stay pending resolution of its appeal. Plaintiffs oppose the stay, arguing that EPA has not met the heavy burden to win a stay. While the Court does not believe EPA is entitled to a stay pending appeal, the Court granted EPA's motion for a stay pending the Fourth Circuit's decision on a request for a stay pending appeal should this Court deny EPA's current motion. Order Granting the Parties' Joint Motion, ECF No. 96.

## II.    Legal Standard

"[I]t has always been held that as part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal." *Nken v. Holder*, 556 U.S. 418, 421 (2009) (quoting *Scripps—Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9 (1942)). Rule 62(c) of the Federal Rules of Civil Procedure affirmatively invests federal district courts with the power to stay a final judgment granting an injunction pending its appeal. Fed. R. Civ. P. 62(c). The Supreme Court has long applied a four-factor test to determine whether a stay is warranted. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The now familiar factors are:

> 1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; 2) whether the applicant will be irreparably injured absent a stay; 3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and 4) where the public interest lies.

*Nken*, 556 U.S. at 434 (quoting *Hilton*, 481 U.S. at 776). A stay of this kind "is considered 'extraordinary relief' for which the moving party bears a heavy burden.'" *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 558 (E.D. Va. 2016) (quoting *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004)).

## III.    Analysis

### A.  *Likelihood of Success on Appeal*

Turning to the application of the first factor, whether EPA has made a strong showing of success on appeal, the Court finds that it has not met this burden. Application of this factor has bedeviled trial courts in this Circuit and this Court in particular. Consideration of whether an appeal of the trial court's decision will succeed puts the trial court in the awkward position of having to weigh the correctness of its decision as judged by an appellate court when it almost certainly would have evaluated that consideration in its ruling on the merits. Put perhaps more precisely, the first

factor requires a trial court to judge the probability that an appellate court will accept the trail court's decision as correct when the trial court quite obviously believes that it has made the right choice. This Court acknowledged "the concerns at stake when a given court is asked to decide upon the correctness of its own ruling" in a recent decision. *Ohio Valley Envtl. Coal. v. Army Corps of Eng'rs*, 890 F. Supp. 2d 688, 693 (S.D. W. Va. 2012) (*OVEC*).

In light of this tension, courts in this Circuit have taken slightly differing approaches. Some trial courts have simply applied the standard in a straightforward manner. In these cases moving parties must make a "strong showing" of success on appeal. *See, e.g.*, *Personhuballah*, 155 F. Supp. 3d at 559; *Scott v. Metro. Health Corp.,* No. 5:12-cv-383, 2013 WL 6145541, at *1–2 (E.D.N.C. Nov. 21, 2013). Others, including the Federal Circuit, have adopted a standard that steps slightly away from a rigid application of the first factor. In these cases, courts balance the first two factors, likelihood of success on appeal and irreparable injury, such that a stronger showing of irreparable injury will slightly reduce the showing required for the first factor. In other words, "[w]hen harm to applicant is great enough, a court will not require 'a strong showing' that applicant is 'likely to succeed on the merits.'" *Standard Heavens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 513 (Fed. Cir. 1990) (quoting *Hilton*, 481 U.S. at 776); *see also, e.g.*, *Par Pharm., Inc. v. TWI Pharm., Inc.* No. CCB-11-2466, 2014 WL 3956024, at *2 (D. Md. Aug. 12, 2014) (quoting *Hilton*, 481 U.S. at 776). A showing of serious questions going to the merits so "substantial, difficult, and doubtful, as to make them a fair ground for litigation" may be sufficient to satisfy the first element. *Standard Heavens*, 897 F.2d at 513 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)); *see also U.S. Home Corp. v. Settlers Crossing, LLC*, No. DKC 08-1863, 2015 WL 3973071, at *5 (D. Md. Jun. 29, 2015).

This Court squared the circle by interpreting the standard to allow for some balancing

between the first two factors but declined to adopt the easily shown "serious questions" standard. The Court held:

> "the first prong never becomes so reduced that a party need only show 'serious questions' because of its strong showing on the other factors. It may be possible that showing somewhat less than a 'strong showing' or 'likelihood' of success on the merits can suffice if the harm to the moving party . . . is great enough; however, that showing must be more than merely pointing to 'serious questions.'"

*OVEC*, 890 F. Supp. 2d at 692. The decision, based on a review of recent Fourth Circuit precedent, reasoned that a more easily attained standard betrays the fact that the trial court has already weighed the evidence before it and rendered a decision on the merits, which the moving party lost. *Id.* at 693. This, the Court believes, is the significant difference between preliminary injunctions, where the trial court can only make its best guess on how the case will turn out, and stays pending appeal where the merits have already been determined. With that in mind the Court concluded that "a party moving for a stay pending appeal must make *at least as strong* a showing on the first prong . . .—and certainly not a lesser showing—as compared to a party moving for a preliminary injunction." *Id.* at 692 (emphasis in original).

EPA supports the slightly lower "serious questions" standard. Mem. in Supp. of Mot. for Stay 4–5, ECF No. 92. On its face, and as defined by the Federal Circuit, the standard seems to overlap with this Court's standard in *OVEC*. Certainly, where a moving party can show serious questions so "substantial, difficult, and *doubtful*," that party also is likely, although not guaranteed, to prevail on appeal. This standard, however, appears to invite an erosion of what "is considered 'extraordinary relief' for which the moving party bears a heavy burden.'" *Personhuballah*, 155 F. Supp. 3d at 558. Indeed, at least one court in this Circuit has indulged such an erosion of the standard. In *Realvirt, LLC v. Lee*, the district court held that the standard by which to determine likelihood of success on appeal is "whether the issues presented on appeal *could be* rationally

resolved in favor of the party seeking a stay." No. 1:15-cv-963, 2016 WL 7325704, at *1 (E.D. Va. Nov. 22, 2016) (quoting *United States v. Fourteen Various Firearms*, 897 F. Supp. 271, 273 (E.D. Va. 1995)) (emphasis added).

Functionally this test would require no more than a non-frivolous appeal, putting the stay in the category of ordinary relief rather than extraordinary. The Supreme Court has reminded lower courts, however, that, "the 'possibility' standard is too lenient." *Nken*, 556 U.S. at 435 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The Court agrees. It is important to remember that the non-moving party has already prevailed on the merits and a court has determined that it is entitled to the relief ordered. Applicants for a stay should not be able to unduly delay "the orderly and expeditious disposition of cases" without an extraordinary showing. *Patterson v. Yeager*, No. 12-01964, 2016 WL 8200506, at *1 (S.D. W. Va. Mar. 3, 2016).

Whatever standard the Court applies to this case, however, save the "mere possibility" standard, the Court is unconvinced that EPA has made a showing that it has any chance of success on appeal.

EPA raises four points which it believes raises questions "so serious, substantial, [and] difficult" as to warrant a stay in this Court's Order. Mem. in Supp. of Mot. for Stay 5, ECF No. 92. EPA's motion rehashes arguments thoroughly addressed and dismissed by this Court's February 14 Opinion. Still, the Court will indulge EPA's desire to relitigate this case in order to provide an explanation of why the Court is unconvinced by EPA's arguments.

i.  *Application of the Constructive Submission Doctrine*

First, EPA contends that the constructive submission doctrine only applies to a prolonged statewide failure to submit any TMDLs for any body of water and the state has no plan to remedy that deficiency. Applying the doctrine to a subset of TMDLs, EPA argues, "necessarily raises

serious and difficult questions as to whether and how the . . . doctrine applies." *Id.* 5–6. Specifically, EPA believes that application of the doctrine to a subset of all TMDLs in a state invades a state's authority to prioritize the order in which it develops them, thus expanding the scope of the doctrine and inviting litigation whenever a favored TMDL is not prioritized. *Id.* 6. EPA then goes on to describe the "robust" TMDL program administered by WVDEP to show that the doctrine is not applicable to West Virginia. *Id.* 6–7.

The Court cannot agree that its Order does anything more than enforce the plain meaning of the CWA. To reprise the Court's Order, the CWA requires states to develop a TMDL for each impaired body of water in that state's boundaries. § 1313(d)(1)(C). It does not require states to have a TMDL program, robust or otherwise. *See id.* Moreover, the CWA requires EPA to review individual TMDLs, not to review whether a state has a TMDL program that produces some, but not all, TMDLs. § 1313(d)(2). The state's duty to produce discrete TMDLs for each impaired body of water is clearly stated in the CWA. § 1313(d)(1)(C). Given the clear directives in the CWA, it makes little sense to argue that a state has a duty to produce a TMDL for each impaired body of water, but where it has produced large numbers of TMDLs and stated that it cannot produce others, it no longer has a duty to produce the TMDLs that it refuses to produce. Even if the Court reads EPA's argument more charitably to in fact argue that the state still has a duty to produce TMDLs which it refuses to produce but that a court cannot compel EPA to act, the argument would render the TMDL program a nullity, or at the very least subject to arbitrary enforcement by EPA. Put succinctly, a state has a duty to produce a TMDL for each impaired body of water; if it does not, EPA has a duty to act; if EPA refuses to act, a court must faithfully enforce the CWA to compel EPA to act. *See San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 882–83 (9th Cir. 2002); *Scott v. City of Hammond*, 741 F.2d 992, 996–97 (7th Cir. 1984); *Alaska Ctr. for the Env't v.*

*Reilly*, 762 F. Supp. 1422, 1429 (W.D. Wash. 1991).

To support the Court's statutory interpretation, it cited *Scott v. City of Hammond*, 741 F.2d 992 (7th Cir. 1984), and *Sierra Club v. McLerran*, No. 11-cv-1759, 2015 WL 1188522 (W.D. Wash. Mar. 16, 2015). EPA believes the Court fundamentally misinterpreted both cases. Mem. in Supp. of Mot. for Stay 7–8, ECF No. 92. The Court cannot agree. As an initial matter, even if it were true that these two cases do not say what the Court interpreted them to say, the obligations imposed on states and EPA by the CWA are clear, and EPA has not been able to supply an argument that convinces the Court that its case raises anything more than a possibility that it may prevail on appeal.

In the February Order the Court interpreted *Scott* to support a finding that the constructive submission doctrine is applicable to a subset of TMDLs. Memorandum Opinion and Order 22, 31–33, ECF No. 87. The *Scott* Court, which created the doctrine incidentally, held that the doctrine could be applied where Indiana and Illinois had failed to produce TMDLs for Lake Michigan, but that on an appeal from a motion to dismiss the court could not determine if the states were preparing to develop the missing TMDLs. *Scott*, 741 F.2d at 996–97. The court remanded the case to the trial court to determine if the states were in the process of developing the TMDLs for Lake Michigan. *Id.* at 994, 997. If they were, the Court reasoned, the doctrine might not be applicable. *Id.* at 997 n. 11.

EPA contends that because the facts were not developed past the pleading stage, the case may have involved a "programmatic" failure in both states' TMDL programs. Mem. in Supp. of Mot. for Stay 7–8, ECF No. 92. It is difficult to see this as anything but a frivolous argument. The case challenged missing TMDLs for Lake Michigan—not a statewide programmatic failure of all TMDLs. *Id.* at 996–97. The Seventh Circuit created the doctrine to address those missing TMDLs

for Lake Michigan. *Id.* It is absurd to claim that the *Scott* Court created the doctrine to apply only to wholesale statewide programmatic failures but failed inform the readers of the opinion that that was *the* material consideration that compelled its opinion. *See id.* EPA's assumption that there was a programmatic failure is either false, or irrelevant to the application of the doctrine. Either way, it in no way undermines this Court's interpretation of *Scott*.

It is true that the *Scott* Court did not find that either state had delivered a constructive submission to EPA. *Id.* at 997. What the *Scott* Court did hold, however, was that the constructive submission doctrine applied to missing TMDLs for a single body of water so long as neither state was in the process of developing those TMDLs. *Id.*

EPA then challenges the Court's reliance on the *McLerran* decision, calling the section cited by the Court dicta and of no precedential value. Mem. in Supp. of Mot. for Stay 8, ECF No. 92. The Court freely admits that the *McLerran* decision is of no precedential value. It is an unpublished decision from a district court in Washington State. *See McLerran*, *McLerran*, 2015 WL 1188522. Its persuasive value is nonetheless undiminished by these features. EPA raised an identical argument in that case, and the *McLerran* Court, just like this Court, rejected it by relying on the plain meaning of the CWA to come to the same conclusion—states are responsible for producing TMDLs for *each* impaired body of water. *McLerran*, 2015 WL 1188522, at *7. EPA, the *McLerran* Court found, cannot avoid its statutory oversight by pointing to TMDLs created for other bodies of water. *Id.* The *McLerran* decision provided helpful guidance to the Court but does not change the words of the CWA from which this Court drew its decision.

  ii. *Prioritization of TMDLs*

At bottom, EPA's first argument rests on the assumption that WVDEP has not "clearly and unambiguously" decided not to submit TMDLs for biologically impaired bodies of water—an

assumption that finds no support in the record. This brings the Court to EPA's second argument. EPA believes WVDEP "reprioritized" biological impairment TMDLs, and as such, this Court's Order invades the state's authority to prioritize TMDLs as it wishes and rejects the state legislature's policy choice, which diminishes the standard for proving a constructive submission. Mem. in Supp. of Mot. for Stay 8–9, ECF No. 92.

If WVDEP had reprioritized these TMDLs, the Court would agree with EPA that it cannot second-guess WVDEP's prioritization. *See* § 1313(d)(1)(A). The record, however, does not support a finding that WVDEP reprioritized the missing TMDLs. *See* Memorandum Opinion and Order 11–17, ECF No. 87. The record reveals that WVDEP publically and unequivocally stated that a state law barred it from producing TMDLs to address biological impairment until it had produced a new methodology for determining biological impairment. *Id.* It stopped working on those TMDLs completely and began developing a new methodology. *Id.* Nevertheless, WVDEP has shown no ability to deliver the new methodology and has not even proposed a projected completion date. *Id.* At the same time, WVDEP proposed dates for developing the TMDLs that are impossible to meet given its lack of progress on the methodology it believed it needed to produce the TMDLs. *Id.* In the Court's opinion, an express and public statement that it will not produce certain TMDLs and a lack of any evidence showing meaningful progress or plan to complete those TMDLs is a clear and unambiguous decision by WVDEP not to submit TMDLs. *See Hayes*, 264 F.3d at 1024. It is not, as EPA argues, a reprioritization, which at minimum would require attainable and verifiable completion dates for the missing TMDLs—something WVDEP has failed to supply. EPA thus is compelled to act where as here there is no support for the belief that WVDEP will comply with its CWA duties. Contrary to EPA's belief that a finding of a constructive submission on this record erodes the standard, in the Court's estimation, it is a rare

case that a state publically and expressly announces that it is not producing certain TMDLs without a plan to comply with its federal duties.

The Court also finds EPA's argument directed at the state's choice of methodology frivolous. Nothing in the Court's Order could be taken to question West Virginia's ability to choose the methodology by which it determines biological impairment. The Court's Order addressed WVDEP's choice to stop producing TMDLs to address biological impairment. While WVDEP claimed that the policy choice made by the Legislature precluded it from producing the TMDLs, a state law cannot preclude WVDEP from complying with federal law. Moreover, neither this Court nor EPA interpret the new legislation to preclude WVDEP from producing biological impairment TMDLs. Draft TMDL for Selected Streams in the Monongahela River Watershed, W. Va. EPA Comments—Oct. 24, 2013, J.A. 188. ("SB 562 does not appear to expressly preclude TMDL development.").

Congress designed the CWA around federal-state partnerships, which enlist states to do the bulk of the on-the-ground regulation and preserves some space for states to act according to local concerns. Nonetheless, these partnerships are subject to minimum requirements imposed by the CWA. *See, e.g.*, § 1313. Conflicting state law cannot dilute or nullify these federally imposed minimum requirements. The Court is bewildered by EPA's peculiar commitment to the supremacy of a state law that arguably might not even preclude WVDEP from complying with the CWA. Whatever EPA's reasons, its argument on this point is a perversion of our Republic's federal structure, and certainly does not convince the Court that it has any chance to prevail on appeal.

      iii.    *Scope of the Court's February Memorandum Opinion and Order*

EPA bases its third argument on a glaring mistake in its reading of the Court's Order. Thus, it does not raise any serious questions. EPA contends that the Court's Order applies to all

biologically impaired bodies of water in West Virginia, but WVDEP has issued TMDLs to address biological impairment in a large number of bodies of water, evidencing that the Court has made a serious factual error. Mem. in Supp. of Mot. for Stay 9–10, ECF No. 92. The Court commends to EPA the section of the Court's Order titled "Conclusion." In that section EPA was directed to: "approve or disapprove WVDEP's constructive submission of no TMDLs for all biologically impaired bodies of water *for which no TMDL has been developed to address that impairment* within thirty days." Memorandum Opinion and Order 39, ECF No. 87. To the extent EPA believes that WVDEP has developed TMDLs for other pollutants that may address biological impairment as well, EPA can simply approve those TMDLs. If it has already approved them, then it would appear that EPA need take no further action. Either way, the Court has not overlooked this point.[2]

    iv.   *Standing*

EPA's final argument maintains that the Court's September 9, 2016 Order, ECF No. 81, finding Plaintiffs have standing "raises serious and substantial questions warranting appellate review." Mem. in Supp. of Mot. for Stay 11, ECF No. 92. The Court's September Order found that Plaintiffs' members, by affidavit, regularly used biologically impaired waters throughout the state and sustained injury in fact when EPA failed to act to address the missing TMDLs. Memorandum Opinion and Order 12, ECF No. 81. The affidavits affirmed that Plaintiffs' members regularly

---

[2] EPA's contention raises a curious inconsistency, however. If it is true, as EPA strenuously argues, that WVDEP is actually producing TMDLs to address biological impairment, then WVDEP is, by its own interpretation, violating state law and contradicting its own public statements about biological impairment TMDLs. *See, e.g.*, W. Va. Draft 2014 Section 303(d) List, Suppl. J.A. 4958. If it is the case that, as EPA also argues, there are no "biological impairment" TMDLs, rather only TMDLs to address specific pollutants with numeric limits that will incidentally remedy biologic impairment, then WVDEP's many public statements that it will not produce "biological impairment" TMDLs are meaningless. *See id.*; Huffman Letter, J.A. 3298. The Court finds it hard to believe that WVDEP's many public statements have no relationship to the TMDLs it is or is not producing. In any event, the scenarios implied by EPA's arguments just do not add up.

used approximately 50 bodies of water throughout West Virginia. *Id.* Relying on case law from the Ninth and Tenth Circuits, the Court determined that because Plaintiffs' members regularly use bodies of water throughout the state and WVDEP has ceased issuing biological impairment TMDLs statewide, Plaintiffs have standing to compel EPA to act on the missing TMDLs. EPA believes this Court's reliance on *Alaska Center for the Environment v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994), is misplaced because that decision only applied where a state had failed to issue any TMDLs. Mem. in Supp. of Mot. for Stay 11, ECF No. 92. However, here WVDEP has issued thousands of TMDLs for other bodies of water and as a result Plaintiffs only have standing to challenge the water quality of the bodies of water which they personally use. *Id.* Again, EPA's brief argument on this point does not persuade the Court that there is any likelihood that it will succeed on appeal.

The *Alaska Center* case was a challenge to EPA's refusal to assume its duty to oversee Alaska's TMDL program. *Alaska Center*, 20 F.3d at 983. At the time Alaska had not submitted any TMDLs for impaired bodies of water. *Id.* Plaintiffs in that case, as here, were environmental organizations with members that used bodies of water throughout Alaska. *Id.* at 985. The district court found, and the Ninth Circuit affirmed, that use of waters throughout the state that were impaired by pollution injured Plaintiffs such that they had standing to bring a suit to compel statewide action. *Id.* The Ninth Circuit found "[p]laintiffs established that they were adversely affected by the inadequate water quality of a representative number of waters throughout the state of Alaska." *Id.* The court then determined that it could not restrict standing to only those waters which Plaintiffs' members use because that would run counter to the CWA which committed prioritization decisions to EPA and the states. *Id.* EPA laches on to this last point as support for its argument that this Court's decision is at the very least doubtful because it only applies to a subset

of TMDLs.

EPA's reading of *Alaska Center* is overly simplistic and unpersuasive. The case endorses a theory of standing that recognizes as a sufficient showing that "the aesthetic and recreational values of the area will be lessened by the challenged [in]activity." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2002) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Moreover, in general "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area." *Id.* The plaintiffs in both this case and in *Alaska Center* use bodies of water throughout the state that are affected by pollution that would be addressed by TMDLs which have not been issued because of a statewide decision not to issue them and a failure to act by EPA.

The Ninth Circuit's concern that a challenge to a subset of TMDLs would run counter to the CWA is not applicable here. Had the Ninth Circuit only found standing for bodies of water plaintiffs could prove they use, the court would have inserted itself into prioritization determinations because it would have effectively ordered EPA to review certain bodies of water lacking a TMDL but not others. Put another way, among all the missing TMDLs, all of them in the case of *Alaska Center*, the court would cede to plaintiffs the prioritization of bodies of water in Alaska based on those they happened to use. Thus, by permitting plaintiffs to challenge statewide inaction, the Ninth Circuit preserved the discretion of Alaska and EPA to determine in what order they would address the missing TMDLs. Here, among the class of TMDLs not issued, biological impairment TMDLs in this case, EPA and WVDEP have sole discretion to prioritize them however they see fit, including a prioritization that incorporates all other TMDL priorities in West Virginia. Neither the Court nor Plaintiffs intercede in that discretion by requiring EPA to act. In fact, were the Court to have found, as EPA argues, that Plaintiffs only had standing for the

specific bodies of water they use, the Court would have committed the error which the Ninth Circuit was at pains to avoid.

The Court also relied on two other cases in its September Order that support the holding in *Alaska Center*: *Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013), and *Sierra Club, North Star Chapter v. Browner*, 843 F. Supp. 1304, 1310 (D. Minn. 1993). In the former, the Tenth Circuit held that the plaintiff had standing to challenge oil and gas leasing on thirty-nine leases even though he did not use every single lease area. *Palma*, F.3d at 1155. The Tenth Circuit, relying on *Friends of the Earth*, explained that environmental plaintiffs do not need to use "every bit of land" that will be affected by the challenged activity. *Id.* They only need to show that they use the affected area. *Id.* Similarly in *Sierra Club*, the Court held that the plaintiffs had established injury in fact by showing they were Minnesota residents who swore to using a large number of waters throughout Minnesota, which gave them a personal stake in the quality of waters throughout the State. *Sierra Club*, 843 F. Supp. at 1310. EPA advances no argument related to these cases.

It is clear to the Court from cases that have dealt with this issue or factually similar scenarios that a plaintiff need not use every inch of an area affected by an action or inaction that harms the environment to have standing to challenge it. In this case, the affected area is statewide and Plaintiffs regularly use bodies of water throughout the state directly affected by EPA's inaction. EPA presents no argument to cast doubt on or undermine Plaintiffs standing in this case.

While EPA has failed to convince the Court that it has anything but a mere possibility of prevailing on appeal, and therefore cannot win a stay, the Court will address the rest of EPA's arguments so that the Fourth Circuit may conduct a more thorough review when EPA requests a stay from that court.

B.  *Irreparable Injury*

EPA claims that if it were required to comply with this Court's Order it will suffer irreparable injury in the form of possible future litigation if it disapproves some or all of the missing TMDLs because it could not create the missing TMDLs by the thirty-day statutory deadline, thus drawing another suit from Plaintiffs. Mem. in Supp. of Mot. for Stay 11–13, ECF No. 92. EPA also fears that compliance will imperil limited funds and hours spent on developing those TMDLs that it could not recover, and believes that other EPA Region III programs will suffer due to the diversion of limited resources. *Id.*

EPA must demonstrate that the irreparable harm it faces is *likely* in the absence of a stay—not just a possibility. *Winter*, 555 U.S. at 22. "[B]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Bloodgood v. Garraghty*, 783 F.2d 470, 476 (4th Cir. 1986) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (emphasis in original).

EPA's parade of horrors is certainly possible, but not likely. All of the injuries EPA presents to the Court—future litigation, use of scarce resources, diversions from other EPA programs—flow from disapproval of a large number of TMDLs. Yet, EPA has not acted on the missing TMDLs and cannot, or at least has not, explained to the Court how many TMDLs EPA will disapprove, if any. It is possible EPA will disapprove a large number of TMDLs, but the CWA commits that decision to the sole discretion of EPA. § 1313(d)(2). The Court cannot surmise what EPA's decision will be with any accuracy, and EPA has provided no evidence to help the Court. Importantly, EPA does not claim that irreparable injury will result from determining whether to approve or disapprove the missing TMDLs, which in fact is all the Court ordered EPA to do. The schedule to produce disapproved TMDLs is imposed by the CWA—not the Court. *Id.* On this front

EPA has not demonstrated that any irreparable injury is likely.

To go further, the Court is highly skeptical that if EPA were to disapprove a large number of TMDLs, any of the injuries EPA claims will befall it are injuries recognized by courts as irreparable. Assuming *arguendo* that EPA would be subject to future litigation because it does not expect to be able to comply with CWA deadlines, future litigation is not an irreparable injury. At the very least litigation to compel compliance with federal law, whatever its ultimate merit, should not be recognized as an irreparable injury. As Plaintiffs point out "mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 24 (1974) (citing *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 51–52 (1938)). This seems doubly true where the goal of litigation is compliance with the law rather than some private dispute. The Court is also mindful that the likelihood of future litigation depends solely on the actions of Plaintiffs, which this Court will not attempt to predict.

Again, assuming EPA disapproves a large number of TMDLs, which is by no means certain, what can be characterized as costs of compliance with the Court's Order are not irreparable injuries either. "The key word in this consideration is *irreparable. Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay are not enough.*" *Shays v. FEC*, 340 F. Supp. 2d 39, 48 (D.D.C. 2004) (quoting *Nat'l Cable Television Ass'n v. Columbia Pictures Indus., Inc.*, Nos. 83-1655, 83-2785, 84-3097, 1986 WL 32734, at *1 (D.D.C. Aug. 20, 1986)) (emphasis in original). Numerous courts have held that compliance costs alone are not irreparable injuries, and for good reason. *See, e.g.*, *Natural Res. Def. Council, Inc. v. FDA*, 884 F. Supp. 2d 108, 124 (S.D.N.Y. 2012); *Wisconsin Gas*, 758 F.2d at 674; *Graphic Commc'ns Union v. Chicago Tribune Co.*, 779 F.2d 13, 15 (7th Cir. 1985). If time and money

spent complying with court orders are irreparable injuries, then every agency, or more broadly, every party, subject to an injunction would be able to demonstrate irreparable injury. *Natural Res. Def. Council*, 884 F. Supp. 2d at 124. That would make stays pending appeal ordinary rather than the extraordinary relief they are supposed to be. *Id.*; *Shays*, 340 F. Supp. 2d at 41.

EPA goes on to assert that the use of resources to comply with the Court's Order will "have a significant, negative impact" on EPA's other CWA duties. Drago Decl. ¶ 8, ECF No. 91-1. The Court has no doubt that EPA's resources are limited and may become more so. Compliance with the Court's Order, assuming a number of other contingencies already noted, may result in reduced staffing on other projects and less money to expend on EPA's other programs. *See* Drago Decl. ¶¶ 8–10, ECF No. 91-1. What compliance will not do is "substantially endanger" EPA's mission to enforce the CWA. *Natural Res. Def. Council*, 884 F. Supp. 2d at 124. EPA does not argue as much. *See* Drago Decl. ¶¶ 8–10, ECF No. 91-1. Without a showing that its core mission is substantially endangered, the Court is reluctant to find that EPA faces irreparable injury if it were to comply with the Court's Order. *See Natural Res. Def. Council*, 884 F. Supp. 2d at 124; *cf. Wisconsin Gas*, 758 F.2d at 674 (finding irreparable injury where the loss of funds in compliance with a court's order "threatens the very existence of the movant's business").

In short, the irreparable injuries EPA expects to suffer are contingent on a number of events that may never come to pass, including whether it will disapprove of the missing TMDLs. Even if they did come to pass exactly as EPA predicts, the harms EPA throws up as irreparable injuries are not recognized as such by any court.

C.  *Harm to Other Parties*

Plaintiffs and EPA disagree over whether a stay would impose substantial harm on Plaintiffs. Plaintiffs argue that although a TMDL will not immediately result in improved water

quality, it is an integral part in cleaning up unchecked pollution and has been delayed long enough. Pl.'s Resp. to Mot. for Stay Pending Appeal 16–18, ECF No. 97. EPA contends a brief stay will result in no harm because reductions in pollutants as a result of a TMDL take years to accomplish as the TMDLs limits are incorporated into National Pollution Discharge Elimination System ("NPDES") permits when they are renewed over time. Mem. in Supp. of Mot. for Stay 13–15, ECF No. 92.

Both this Court and the Fourth Circuit have previously stated, "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *OVEC*, 890 F. Supp. 2d at 693 (quoting *S.C Dep't of Wildlife & Marine Res. v. Marsh*, 866 F. 2d 97, 100 (4th Cir. 1989)) (citing *Ohio Valley Envtl. Coal., Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868, 899 (S.D. W. Va. 2010)). The Court is also aware of the lag time between creation of a TMDL and the implementation of its pollution limits.

Still, any further delay only postpones the eventual implementation of TMDL limits in NPDES permits. Each day that passes without limits set by federally mandated TMDLs visits environmental harm on Plaintiffs' members who regularly use bodies of water that would contain less pollution had WVDEP issued TMDLs. Viewed in this way a stay, even a brief one, would lead to an increase in future environmental harm, which by all accounts is irreparable. It is also important to note that all of the missing TMDLs are at least five years overdue, with some possibly missing for more than a decade. *See, e.g.*, W. Va. 1998 303(d) List, J.A. 1205 (Rattlesnake Hollow). To say that a further delay will therefore not harm Plaintiffs is nonsensical, especially given EPA's belief that it will take a considerable amount of time to develop the missing TMDLs. Drago Decl. ¶ 5. ECF No. 91-1. Beginning the process sooner brings the completion date closer, reducing the amount of time unregulated pollution is discharged into West Virginia bodies of

water.

EPA also relies on what it believes is the uncertainty of the effects of any future TMDL since none of the substance of any of the missing TMDLs has been developed. Mem. in Supp. of Mot. for Stay 13–15, ECF No. 92. That type of uncertainty is an important consideration if, as this Court already found, the exact limit of the TMDL would affect certain industry practices and the content of NPDES permits. *See* Memorandum Opinion and Order, ECF No. 32. Without the substance of the TMDL, concerns over how it will affect those interests is pure speculation. Here, however, that kind of speculation is irrelevant. All any future TMDL would need to do is reduce pollution in the specific body of water it was meant to address. EPA cannot seriously argue that because the substance of any future TMDL is uncertain, no one can predict what effect it will have on the body of water it is meant to address. If that were true, that would mean certain TMDLs, which not inconsequently Congress believed would reduce water pollution, might have no effect on water quality. The Court will not second-guess Congress' belief that a TMDL will reduce ambient water pollution, regardless of the exact substance of the finished product. More specifically, it is not what the limits are, but whether those limits will improve water quality, and the Court is convinced that Congress included TMDLs in the CWA and mandated their implementation to improve water quality. Accordingly, the Court believes a further delay in its order is likely to substantially harm Plaintiffs and their members.

D.  *Public Interest*

Finally, the Court is not convinced that a stay is in the public interest. EPA's belief that a stay is in the public interest is premised on its belief that it will prevail on appeal. But as thoroughly explained in this Court's February Order and in this Order, EPA has shown no meaningful probability to prevail on appeal. EPA also argues obliquely that efficient use of its resources is

also in the public interest. This is undeniably true but not absolute. The public's interest in efficient use of agency funds ranks somewhat lower measured against the public's interest in compliance with the law, or even against the public's interest in the protection of the integrity of aquatic environments in West Virginia. "The Clean Water Act benefits all [West Virginians]. The public interest is best served by prompt action, even any meaningful action, on the part of the State and the EPA to comply with the law's charge." *Friends of the Wild Swan, Inc. v. EPA*, 130 F. Supp. 2d 1207, 12013 (D. Mont. 2000). Accordingly, although EPA raises some concerns about where the public interest lies, the public has greater interest in compliance with federal law and protection of the environment than it does in the efficient use of agency resources necessary to accomplish that compliance.

### IV.    Conclusion

For the reasons stated EPA's Motion to Stay Pending Appeal is **DENIED**. ECF No. 91. In accord with this Court's Order Granting the Parties' Joint Motion, ECF No. 96, this Court's February Order compelling EPA to review the missing TMDLs is **STAYED** until fourteen days after the Fourth Circuit rules on EPA's request for a stay pending appeal from that court.

The Court **DIRECTS** the Clerk to send a copy of this Opinion and Order to counsel of record and any unrepresented parties.


ENTER:    May 2, 2017


_____
ROBERT C. CHAMBERS, CHIEF JUDGE